Buel vs. The State.

BUEL, Plaintiff in error, vs. THE STATE, Defendant in error.

*September 12 — September 26, 1899.*

*Criminal law and practice: Homicide: Evidence:* Corpus delicti: *Circumstantial evidence: Cross-examination: Instructions to jury: Defining "reasonable doubt:" Material and immaterial errors.*

1. The *corpus delicti,* and every element of it, in a criminal case may be established by circumstantial evidence as well as by positive or direct evidence, if such circumstantial evidence produces in the minds of the jury conviction, to a moral certainty, of the existence of all the requisite facts and excludes every other reasonable hypothesis.

2. The reception of irrelevant evidence against objection, prejudicial, if at all, by reason of an unwarranted use of it by counsel in addressing the jury or significance given to it by the instructions of the court, is not reversible error.

3. The right of cross-examination extends to a reasonable inquiry into the previous life and character of the witness, so far as the same bears on the credibility of his evidence, and the extent to which such examination may be carried rests in the sound discretion of the court, though it is an abuse of judicial authority to allow questions to a witness as to irrelevant matters, regardless of whether there are any circumstances reasonably suggesting them or they reasonably bear on his credibility, and for the purpose of creating, or which are manifestly calculated to create, prejudice in the minds of the jury against the witness, and, if he be a party, influence them to find against him because of such prejudice.

Buel vs. The State.

4. For the purpose of explaining the circumstance that soon after a homicide for robbery the supposed guilty party was much improved financially, he testified that a few months before the homicide he and the deceased conducted a profitable partnership business; and to rebut that the court permitted a memorandum book of the deceased in evidence, saying that it tended to impeach the evidence of the accused, which book did not show, definitely, that it was other than a personal memorandum book; there was no evidence that the accused ever saw or was in any way concerned with it; and it did not refer, intelligently, to any business transactions between the accused and the deceased. *Held*, prejudicial error.

5. Evidence of threats made by third persons against the deceased was properly rejected, because, if offered to show motive for his leaving the country, it was irrelevant in the absence of evidence that he had knowledge of the threats; further, there was no controversy as to the real motive, and if offered to show that some other person than the accused was the guilty party, the evidence was irrelevant and hearsay.

6. A refusal to instruct the jury on the subject of the certainty of the existence of the facts requisite to a conviction, *held* not reversible error, since the general charge contained full instructions on the subject.

7. The giving of properly worded, specific explanatory instructions on the subject of reasonable doubt at the request of the attorneys for the accused, approved and advised; but a refusal to do so, when the general charge is full and plain on the subject so as to be understood, reasonably, by persons of ordinary comprehension, *held* not reversible error.

8. The giving of special instructions on leading legal questions, as requested, or embodiment of them in the general charge, especially in an important case where such special instructions are more specific than the general charge, advised; but the refusal to do so when such general charge is sufficiently plain to be understood by persons of ordinary comprehension, *held* not error.

9. Instructions so worded as to be difficult to understand, and so worded as to admit, reasonably, of a construction that would mislead the jury on a material point, *held* reversible error.

10. A general order to strike out all the hearsay evidence admitted on a trial, made at the close of the trial, without specifying the particular evidence referred to, leaving it to the jury to determine what is and what is not hearsay evidence, *held* error.

[Syllabus by MARSHALL, J.]

ERROR to review a judgment of the circuit court for Sawyer county: JOHN K. PARISH, Circuit Judge. *Reversed.*

The facts are stated in the opinion.

For the plaintiff in error there was a brief by *J. B. Alexander,* attorney, and *V. W. James,* of counsel, and oral argument by *Mr. Alexander.*

For the defendant in error there was a brief by the *Attorney General,* and oral argument by *C. E. Buell,* first assistant attorney general.

MARSHALL, J. The evidence produced on the trial established or tended to establish the following:

Peter F. Nelson,— an unmarried man of about twenty-four years of age, who had resided for a considerable length of time prior to the 17th day of September, 1896, with the plaintiff in error, *Eugene Buel,* a man of about thirty-six years of age, near the Indian reservation in a thinly settled district in Sawyer county about nine miles from the village of Hayward,— in August, 1896, was charged by one Wettenhall with being guilty of having sustained criminal relations with the latter's daughter and being the cause of her supposed condition of pregnancy. That resulted in Wettenhall and Nelson meeting a day or two thereafter, by appointment, at the village of Hayward, where Wettenhall insisted on Nelson marrying the daughter, which he declined to do. Soon thereafter, on the same day, on hearing that he was about to be prosecuted respecting the charge of causing the pregnancy of the Wettenhall girl, Nelson fled from the county and thereafter remained in hiding till about the 16th day of September following, when he met *Buel,* by appointment, at a railway station a short distance from Hayward, from which point the two traveled together to Hayward, arriving there about daylight on the succeeding day. The purpose of the trip to Hayward was to enable Nelson to draw some $400 which he had in the Sawyer

County Bank and then leave the county before his presence at Hayward could become sufficiently known to lead to his arrest. Pugh, the cashier of the bank, was called upon by Nelson and *Buel* at his house before daylight on the day named and informed of the purpose of Nelson as stated, and that he intended to go to Chicago by way of Ashland. Pugh acceded to the request to immediately get the money for Nelson and to aid in keeping his presence in Hayward secret, and thereupon went to the bank and obtained such money, *Buel* and a policeman going with him, and Nelson remaining at the house. Pugh returned to his house with the money and paid it to Nelson, whereupon the latter and *Buel* immediately departed, going in the direction of *Buel's* home. The last that was seen of Nelson alive, he was in the company of *Buel* a few miles from the latter's home on the day in question.

On the day of the occurrence related, *Buel* was observed traveling on the road from Hayward toward his home alone, carrying a satchel, and later in the day he left his home with a pail and gun under the pretense that he was going to carry a lunch to Nelson; and still later the same day he returned home in a nervous condition and reported that Nelson complained that he had been chased by Indians. After the disappearance of Nelson as related, he did not write to any of his old neighbors or acquaintances as he was accustomed to do when away from home. *Buel*, during the time Nelson lived with him, was a very poor man and a very poor provider for his family, but after the latter's disappearance there was a significant change in that regard, and there were other things, such as the purchase of a tract of land by *Buel* for $200 and various articles of personal property, indicating that he was possessed of a considerable sum of money. He took possession of all the personal effects of Nelson and treated them in every way as his own.

In July of the next year after the occurrences detailed in the foregoing, the remains of a human being were found lying on the back in a bunch of thick bushes a few miles from where Nelson was last seen with *Buel* and within about half a mile from an unoccupied homestead claim of *Buel*, and somewhat further from such a claim which belonged to Nelson. The location of the discovery was in an out-of-the-way place some four miles from any inhabited building except an old logging camp about a mile and a half away, which was occupied by a watchman. It was near an old Indian trail and the usual route from *Buel's* place of residence to his homestead claim. The fragments of the skull indicated that either before or after death it was broken in by some crushing blow or blows. The shoes were on the feet and the clothing was sufficiently preserved to show the color. No money or thing of value was found near the remains except a pocketknife, which was identified as one of two knives that had been sold by a merchant in Hayward, one of which was sold to Nelson. The trousers and shoes found on the remains were similar to those worn by Nelson.

Evidence was produced to explain or discredit much of the evidence of the circumstantial evidentiary facts mentioned, and to impair the probative force of circumstances established, pointing to the guilt of *Buel*. The jury found him guilty of murder in the first degree, and judgment was entered accordingly.

The motion to acquit the plaintiff in error and the motion to set aside the verdict for want of sufficient evidence to warrant a conviction were properly denied. Upon each vital question in the case there was credible evidence tending to establish the fact involved, contradicted or explained in many instances, it is true, by other evidence; but it was for the jury to weigh all the evidence and determine where the truth lay. Such determination is conclusive, unless we

can say it was not warranted in any reasonable view of the
evidence, and we clearly cannot say that.   True, the evi-
dence was all circumstantial, but that does not count strongly
against the conviction, since a conviction may as well rest
on circumstantial evidence as on direct evidence, if it has
the necessary probative power to convince the mind beyond
a reasonable doubt of the existence of each of the elements
requisite to make out the charge and exclude to a moral
certainty every other reasonable hypothesis.   If the jury
believed that the knife, shoes, and clothing found on the re-
mains were those which formerly belonged to Nelson, such
facts, in connection with the undisputed circumstance that
he disappeared a few miles from where the remains were
found and that their location was near his homestead where
he was likely to have gone under the circumstances, in the
absence of any satisfactory evidence that he was ever seen
after the disappearance, or heard of or from, by anybody,
or any evidence to suggest a probability of the remains
being other than his, they might well and readily have said,
as they did, that no doubt founded in reason could exist but
that Nelson was dead and all that remained of his body was
that discovered in the brush, as related.   Having determined
the initial question as indicated, that and the undisputed
facts that when Nelson disappeared he had a large sum of
money and probably a watch upon his person, that none
of such property was found upon the remains, and that
the skull was broken in such a way that if the injury
was inflicted upon the person while living it necessarily
caused death, certainly warranted the jury in saying that
there was no reasonable theory of the cause of death other
than that some human agency produced it, and that the
crime of deliberate murder was committed.   Having reached
that point, the circumstances pointing to *Buel* as the guilty
person were numerous.   The facts that he was the only
person known to have been in Nelson's company at about

the time of the homicide, that he was the only person who knew Nelson had upon his person a large sum of money, and the further facts that his financial circumstances materially changed immediately after Nelson's disappearance, and that he appropriated all of Nelson's personal property to his own use without any satisfactory explanation of such conduct; that he pretended to have seen Nelson, and acted and talked strangely in regard to him, the day of the disappearance; and many other things which might be mentioned which appear in the evidence,— if not deemed by the jury to have been satisfactorily explained so as to leave a reasonable doubt in their minds as to the existence of any of such incriminating circumstances,— may well have moved them to conclude, as they did, that such circumstances were consistent with the theory that *Buel* committed the homicide, and inconsistent with any other reasonable hypothesis.

The argument on this branch of the case in behalf of plaintiff in error by his counsel only brings to our attention the fact that as to many of the circumstances mentioned the evidence was conflicting and was circumstantial. It is not claimed but that there was evidence bearing upon every essential question involved in the charge and every one of the evidentiary facts mentioned. That being the case, it was for the jury to weigh the evidence, and this court cannot test their determination by its own conclusion.

It appears to be strongly urged that the verdict was not warranted by the evidence as to the *corpus delicti*, because on that subject there must be positive evidence or circumstantial evidence of such probative power as to convince the mind beyond the possibility of error. To support that contention, *State v. Davidson*, 30 Vt. 377, was cited to our attention, where it is said that "the cases all hold that where the *corpus delicti* is attempted to be shown by circumstantial evidence, it must be positively established so as to exclude all uncertainty or doubt from the minds of the jury; not

that each particular circumstance must be of that conclusive character, but all combined must produce the same degree of certainty as positive proof.", That must be construed to mean that circumstantial evidence is competent and sufficient to establish every element of the *corpus delicti* if as convincing as positive or direct evidence. It recognizes the sufficiency of circumstantial evidence, and as to each element of the subject under consideration. Certainly, the learned judge did not intend to convey the meaning that the essential fact he was discussing must be established beyond the possibility of a doubt. His concluding language shows that the degree of certainty which leaves no reasonable doubt on the question is all that is required as to every element in a criminal homicide. Positive evidence, even, cannot go further than that in the practical affairs of life, and if greater certainty than that were required in a criminal prosecution, in order to warrant a conviction, punishment for crime would be well-nigh if not quite impossible, and the safety of human life be without adequate legal guardianship.

There are many authorities that might be cited to support the doctrine that positive evidence is required to establish at least the element of death by criminal means, and in many legal opinions language is used which would indicate a holding that positive evidence must go further and establish the fact of identity. In *Ruloff v. People,* 18 N. Y. 179, it was stated as the undisputed law, that no one should be convicted of murder upon circumstantial evidence unless the body of the person *supposed to have been murdered* has been found, or there be other clear, irresistible proof that *such person* is actually dead. Baron PARKE, in *Reg. v. Tawell,* a case not easily found reported in the books, but referred to in Wills, Circumstantial Evidence (3d ed.), 180, and contained in full in Trials for Murder by Poisoning, compiled by Brown & Stewart (1883), used substantially the same lan-

guage, and the conclusion was reached that as to the death of the *party supposed to have been murdered*, positive evidence is necessary. Such appears to be the fair reading of the early New York cases, but that is denied, or if not denied overruled, in more recent decisions, as will be hereafter indicated. In *People v. Bennett*, 49 N. Y. 137, the same rule was applied, the opinion distinctly stating that in the *Ruloff Case* the basis of the *corpus delicti*, that the person *alleged to have been murdered* was not found dead, was wanting. That rule, it was supposed, was crystallized into statute law by section 181 of the New York Penal Code in the following language: "No person can be convicted of murder or manslaughter unless the death of *the person alleged to have been killed* and the fact of killing by the defendant, as alleged, are each established as independent facts; *the former by direct proof* and the latter beyond a reasonable doubt." But in *People v. Beckwith*, 108 N. Y. 67, it was held that positive evidence of facts bearing directly by way of inference on the ultimate fact to be established, satisfied the call of the statute for direct proof. There the facts established by direct evidence were quite similar in character to those here. The person supposed to have been murdered disappeared. Near where he was last seen fragments of a human body were found, on which were indications pointing to the probable means of his death, and the clothing found was testified to as that worn by the missing man. These circumstances and others, all established by direct evidence and all pointing to the existence of the ultimate fact sought for, it was said, constituted direct proof within the meaning of the statute and the rule requiring positive proof. A distinction was drawn between proof and evidence, the one being the medium of proof and the other the effect of evidence. The effect of that decision was to limit the requirement of positive evidence under the rule of the earlier decisions to evidence establishing evidentiary facts so as to enable every element

Buel vs. The State.

·of the *corpus delicti* to be established by circumstantial evidence as the term is commonly understood — evidence of facts which tend to prove the ultimate fact in issue. Later, the same subject was under discussion in *People v. Palmer*, 109 N. Y. 110, and the idea was rejected that either the ;statute of New York or previous adjudications of the court required positive proof of anything but the death of a human being by criminal means. It was said that a contrary rule would put a premium on brutality and prevent the punishment of criminal homicides, for the perpetrator would have ·the strongest motive possible to mutilate or destroy the body ·of his victim so that direct evidence of identity would be impossible. The conclusion reached was that the rule requiring direct evidence only applies to the fact of the death of a human being requiring investigation, and not to the identity ·of the subject of the homicide, and that if there is evidence ·of the existence of a dead human body having a fractured skull sufficient to produce death, accompanied by circum;stances excluding all reasonable inference that it was produced by accident or suicide, the rule requiring positive ‑evidence as to the *corpus delicti* is satisfied. It was further said that such rule never did include identity of the victim, but left that open to.either direct or circumstantial evidence. This closes the review of authorities upon which counsel for plaintiff in error rely. They really leave but the fact of death to be proved by positive evidence, and hold that the discovery of fragments of a human body under circumstances pointing beyond a reasonable doubt to criminal 'means as the cause of death, fully satisfies the requirement for positive proof; and that direct and positive evidence of evidentiary facts from which the main fact is inferable with a certainty that excludes to a moral certainty every other ·reasonable hypothesis, is positive proof.

This court has spoken in no uncertain language on the .subject under consideration. No question in regard to it is

open in this state. A reference to authorities elsewhere is here made because of the importance of the question in this case, and to demonstrate the universality of the doctrine here applied. In *Zoldoske v. State*, 82 Wis. 580, the following language was used: "The substance of the offense may be proved as well by circumstantial as by direct evidence;" and further, quoting with approval from a standard text writer: "No universal and invariable rule can be laid down, and every case must depend upon its own particular circumstances; and, as in all other cases, the *corpus delicti* must be proved by the best evidence which is capable of being adduced, and such an amount and combination of relevant facts, whether direct or circumstantial, as will establish the imputed guilt to a moral certainty, and to the exclusion of every other reasonable hypothesis." No distinction is recognized between the different elements of a homicidal offense, as to the degree of certainty necessary to establish it, or the nature or the kind of proof required. Such is the view expressed by the text writers generally. McClain, Cr. Law, § 396; Underhill, Cr. Ev. § 312; 3 Greenl. Ev. § 30; Will, Circ. Ev. 354; 1 Bish. Cr. Proc. (2d ed.), § 1071. There are many striking illustrations of this doctrine in the books. In *Ex parte Kearny*, 55 Cal. 212, the body of the murdered man was destroyed by fire so that no part of it was ever discovered but some pieces of bone, not recognizable as human bones. In *State v. Ah Chuey*, 14 Nev. 79, the body was destroyed by fire beyond recognition. So in *Comm. v. Webster*, 5 Cush. 295, the body had been dissected and many parts of it completely destroyed, particularly the head, leaving no part that could be positively said to have been a part of the body of the supposed murdered man. In *State v. Williams*, 7 Jones Law (N. C.), 446, shortly after the disappearance of a woman, near a point where she was likely to have been some bones were found in the ashes of a burned log heap, and some hairpins were found likewise, similar to those she

had worn. Numerous other instances might be cited where the body of the murdered person was destroyed by fire or acids or in some other way, many of which instances are referred to in Whart. Hom. § 640, and notes.

So it may be taken as the settled law that the *corpus delicti* in criminal homicide, and each element of it, may be established by circumstantial evidence, and that no greater degree of certainty is required than in regard to the fact of the guilt of the person charged. Any language in *State v. Davidson*, 30 Vt. 377, indicating that the former element must be established with such certainty as to exclude any doubt on the question, is not correct. True, the initial question when criminal homicide is charged is, Was a human being deprived of life by criminal means? and the next question, Was he the person alleged to have been murdered? And such questions, particularly the first, because of their supreme importance, require, ordinarily, stronger evidence than the questions which follow. Such importance is obvious from the well-known fact that convictions and executions have taken place, and thereafter the persons supposed to have been murdered have been discovered alive. The more important the question in any case, the greater the proof required to establish moral certainty in the mind, but when that certainty is established, whether by circumstantial or direct evidence, the fact itself must be said to be established. Enough has been said to show that there was ample evidence in this case to go to the jury on every element of the *corpus delicti*, and that the assignments of error on that subject cannot be sustained.

The state was permitted to show against objection that, after Nelson disappeared it was discovered that the charge against him, founded on the theory that the Wettenhall girl was pregnant, was without foundation. That evidence was drawn out as a basis for a claim before the jury, as it is said, that *Buel* knew before Nelson disappeared that the latter

Buel vs. The State.

was in no danger from the Wettenhalls, and that he purposely omitted to disclose such knowledge to his intended victim in order that he might have the benefit of Nelson's reputed departure from the county to avoid a criminal prosecution, to account for such disappearance without the finger of suspicion being turned upon him; and the court submitted that theory to the jury by the charge. It seems that no proof was offered as to when the true condition of the Wettenhall girl was discovered, whether after Nelson disappeared or before, and no evidence was given that the charge against Nelson was fraudulently made, or that *Buel* was a party to a scheme to put Nelson in fear of the Wettenhalls, or that the fact, if it were a fact, that Nelson was falsely charged, was known to *Buel* at any time; so the mere circumstance that it was discovered, some time subsequent to the disappearance of Nelson, that the claim made by the Wettenhalls against him was false, was wholly foreign to the case and ought not to have been received, though we see no reason to claim that the mere admission of the evidence could possibly have worked prejudicially to the plaintiff in error. If he was in any way injured, it was by the use counsel for the prosecution made of the evidence in addressing the jury, and the reference to it in the instructions given by the court; and that is the only prejudice seriously claimed. The difficulty of treating the matter is that the remarks of counsel were not preserved or excepted to, neither were the instructions of the court referring to the evidence excepted to. We must hold that the admission of the evidence was harmless error, and that if error was committed in the use of it, either by the attorney for the prosecution in summing up his case or by the court in instructing the jury, or both, such errors have not been preserved for consideration.

The court against objection permitted the prosecuting attorney on cross-examination to ask the accused these questions: "Did you have any trouble with any man there in

Buel vs. The State.

that house while you were there?" "Do you remember of
making an assault upon a man there and breaking his arm?"
"Did you kill a man at Ord, Nebraska?" "Did you kill
two men at Ord, Nebraska?" "State the trouble you had
at Ord that caused you to leave there?" "Did the insur-
ance company give you any reason for not giving you the
insurance money?" referring to the insurance on a house
belonging to the accused which was burned. "Did you ever
have any talk with any of them that the reason they would
not pay it was that you burned the house yourself?" "What
was the insurance on the house?" To the last question the
accused answered $200, and to each of the others he gave a
negative answer. The court frequently cautioned him that
he need not make answer to any question that would tend
to incriminate him.

It is argued in support of the conduct of the trial at this
point, that on cross-examination the previous life and char-
acter of the witness, especially when he is a party, may be
inquired into to such an extent as in the sound judgment of
the trial court may seem proper. Such is undoubtedly the
settled rule, and it is resorted to generally where the person
accused of crime offers himself as a witness in his own be-
half. There is no rule by which the exercise of that discre-
tionary power of the court can be guarded with exactness.
The range is necessarily broad in order to fit the facts of
particular cases, but there is a limit beyond which it cannot
go. That limit is clearly reached and passed when ques-
tions are asked, manifestly, for the mere purpose of creating
prejudice in the minds of the jurors, or the examination is
carried on to such an extent and in such a manner as to be-
come oppressive, and is not warranted by anything in the
case. Questions as to previous convictions of criminal of-
fenses, or serving terms in prison or in jail from which con-
victions will be presumed, are uniformly permitted when the
instances are not too remote, upon the theory that a person

of that character will not be as likely to testify truthfully as a man whose life has not been thus blackened. Our statute (sec. 4073, Stats. 1898) expressly allows that kind of cross-examination. Questions relating to mere criminal charges, or acts which might be the foundation for criminal prosecutions, are usually rejected. They should not be permitted unless there are circumstances in the case suggesting that justice will or may be promoted thereby. It would be a clear abuse of judicial discretion to permit such questions where the indications are plain that the purpose is not to bring out the truth in regard to the witness's life and character, and to thereby discredit his testimony, but for the purpose of discrediting the witness regardless of whether there is any warrant for the questions or not, and if he be a party, in that way to influence the minds of the jurors into a verdict against him.

The administration of justice requires that trial courts shall not have their discretionary powers circumscribed by any very narrow boundaries, but does require that such limit shall be placed upon them as will prevent any mere prejudice to be built up in the course of a trial, especially in an important case like this, which will tend to influence a jury to determine the facts otherwise than from the legitimate evidence produced in court. It seems clear that such limit was passed in allowing the cross-examination in question, to the extent to which it was carried. It is one thing to honestly ask questions on cross-examination for the purpose of discrediting a witness, and quite another to ask questions of a witness who is a party, especially in a serious criminal case, for the purpose of injuring his cause in the eyes of the jury, and leading them to believe he was likely, because of his bad character, to have committed the offense charged. A reading of the questions under consideration leads to the irresistible conclusion that no idea was entertained by the cross-examiner that proof would be elicited of the matters

Buel vs. The State.

implied by them. We say "implied" because the asking of the direct questions in the manner in which they were asked implied to some degree that the examiner was possessed of information upon which the questions were based, and although the answers were in the negative, the bad effect of the insinuations thrown out by the questions was not and could not have been removed entirely from the minds of the jurors. It is useless to refer to authorities on this subject. Text writers and adjudged cases are generally in accord that, so long as the cross-examination is carried on with reasonable fairness, to test the credibility of the witness, it is permissible, but the moment questions are asked concerning facts touching the witness's character, which are irrelevant to the facts in issue, for any other purpose than to affect his credibility or which manifestly do not bear on the subject of credibility, the right of cross-examination is abused, and on objection should be ·restrained within legitimate limits. Whart. Crim. Ev. §§ 473, 477, and notes.

The general rule, that the previous life and character of a witness can be inquired into, must be preserved, and the broad discretionary power of trial courts in administering such rule fully recognized. The trouble here is that the cross-examination was allowed to be carried on manifestly without any reason except to create prejudice against the accused in the minds of the jurors. It was well calculated to have that effect and to bear materially on the ultimate result, especially since the whole case rested on circumstantial evidence. It is clearly reversible error that cannot be overlooked without lowering the standard of justice which it is the duty of the court to rigorously maintain.

The accused endeavored to account in part for the change in his financial condition, which the evidence tended to show manifested itself soon after the disappearance of Nelson, by proving that he made a horse-doctoring trip with Nelson in the spring of 1896 and realized therefrom about $200. To

throw discredit on the testimony of the accused in that regard, the prosecution offered in evidence a memorandum book containing some writing on a few pages, which was testified to as being in the handwriting of Nelson. That evidence was received against objection, the court remarking, in substance, that it tended to contradict the testimony of the accused. On one page, under date of April 30, 1896, are several entries of debit and credit items, relating to traveling expense, but with nothing to show any connection of *Buel* therewith, or any one other than the person who made the memoranda. On one page, under date of October 24th, the year not being stated, and the words " E. M. Buel, cash received " being written at the top of the page, are several entries aggregating $25.75. On one page, under date of May, 1896, there is one entry of a debit and a credit item, no name appearing or indication of what the entries refer to. On one page, under date of April 30, 1896, are several entries referring, apparently, to the cost of a span of horses, set of harness, wagon, and some small articles. On another page, under date of April 30, 1896, entitled " Medicine Bill," are several entries of debit and credit, with a balance brought down. All entries but two, other than those made in October of an unknown year, were made at one time, and there is nothing to indicate that *Buel* had any connection with them or with the book, and there is no evidence that he ever saw or knew of it, or to show, except by mere surmise, that the entries had any relation to any business transactions between Nelson and *Buel*, except those which refer to a date long before the horse-doctoring trip. Upon what principle the book was admitted in evidence as tending to impeach the evidence of *Buel*, is not discoverable. It had no such effect, legitimately. It received that effect merely by the suggestion of the court that it tended that way. The book was, at most, only a private memorandum book of Nelson, containing unintelligible entries so far as relate to any circumstance

bearing on this case.   The receipt of it by the court as im-
peaching evidence on one of the material though possibly
not necessary evidentiary circumstances in the case, that is,
the financial circumstances of the accused after the disap-
pearance of Nelson, was highly prejudicial.

The court refused to allow proof of declarations of third
persons containing threats against Nelson.   If that evidence
was offered for the purpose of showing motive for Nelson's
leaving the county, it was immaterial, in the absence of any-
thing to show that the threats were communicated to Nelson.
Again, the motive that moved Nelson to go away was fully
established to be fear of the Wettenhall prosecution, and
there was no dispute on that question.   If the evidence was
offered for the purpose of creating an inference that some
one other than *Buel* was guilty of the homicide, the evidence
was clearly inadmissible.   Wharton, Crim. Ev. § 225, and
note; Jones, Ev. § 300; *State v. Haynes*, 71 N. C. 79; *State
v. Weaver*, 57 Iowa, 730.   It was properly rejected on any
theory.

Evidence was rejected regarding statements made by *Buel*
to third persons before the commission of the offense, as to
his intention to buy a farm.   The evidence was directed to
a time so near the homicide that it was properly rejected as
self-serving declarations.   It was also properly rejected upon
the ground of being pure hearsay.   *McKinnon v. Meston*,
104 Mich. 642.   Again, proof of a mere purpose to buy a
farm some time after the homicide, would have had such a
very remote bearing, if any, on the evidentiary circumstance
of the sudden change in the final circumstances of the ac-
cused, that it was properly rejected on that ground.   It may
be freely admitted that proof of declarations to establish the
fact of intent is admissible in a proper case.   *Mut. L. Ins.
Co. v. Hillmon*, 145 U. S. 285; *Insurance Co. v. Mosley*, 8
Wall. 397.   But the offer in question does not come within
the rule in that regard or of any of the exceptions to the
general rule against hearsay evidence.

Buel vs. The State.

The court was specially requested to instruct the jury that before finding the defendant guilty of any crime they should require equally as strong and conclusive evidence of his guilt as would be required by them as careful and prudent men to enter upon the greatest and most important acts of their lives. The request embodied, substantially, a correct rule of law, which the accused was entitled to have given to the jury, and unless the general charge sufficiently covered it the refusal to grant the request was reversible error.

There are cases in the books of reversals because of erroneous instructions given on the line under consideration. *Anderson v. State*, 41 Wis. 430; *Emery v. State*, 92 Wis. 146. But so far as we know, the failure to instruct at all in that regard, where the jury were fully instructed otherwise on the subject of reasonable doubt, has never been held reversible error or seriously criticised.

The use of such expressions as, "the jury before convicting an accused person should be convinced of his guilt with that degree of certainty requisite to lead men to act in the most important affairs of life," or "in considering the evidence and coming to a conclusion, the jury should exercise all the care, caution, and judgment that men exercise in the most important affairs of life," or the jury "should be convinced only by the same proof as that which would convince men and upon which they would act in the management of the gravest and most important matters, and in arranging the most serious affairs and concerns of life," or the jury "should not convict unless from the whole evidence in the case they have an abiding conviction to a moral certainty that the accused is guilty," are each and all mere explanatory expressions to convey to the minds of jurors the exact meaning of the term "beyond a reasonable doubt" and the degree of certainty which such term calls for. They are generally given as the equivalent of the general expression that, "in order to convict, the jury should be convinced of the guilt of the accused beyond a reasonable

·doubt." The latter expression contains all there is of the rule, and it was given to the jury in this case with commendable fullness. This may be said without expressing an approval of the charge on the subject as a model for ·clearness. The general instructions on such subject, found in the different portions of the charge, are as follows: "A jury is never authorized to convict a man of crime until the presumption of innocence is overcome by credible evidence." "You will not convict the defendant unless you are satisfied from the whole evidence that the defendant, *Eugene Buel*, wilfully, feloniously, and with malice aforethought, ·or with premeditated design to effect the death of Peter F. Nelson, killed and murdered him at the time and place alleged in the information. *If each and all of you are satisfied that each and every material thing* set out in the information is true and has been proved by the evidence beyond every reasonable doubt, you will convict; if you are not so satisfied you will acquit." "The defendant's guilt must be established by the evidence to the exclusion of every other reasonable hypothesis." "If a reasonable doubt exists in your minds of defendant's guilt of any material allegation set out in the information, your verdict will be not guilty. A reasonable doubt, or doubt to be of avail to this defendant, is a doubt founded upon reason." "The state is not bound to prove, in a criminal case, a defendant's guilt beyond all possibilities, beyond all conjectures; for possibilities, conjectures, doubts, will arise in most any, if not all, criminal cases." In view of such full instructions, the question is, Was it error for the court to refuse to give the explanatory instruction requested?

To say that a failure to explain the meaning of the phrase "beyond a reasonable doubt" is reversible error, is a doctrine that has but very little support in the books. Much discussion is found in the adjudged cases as to whether any attempt to explain it does not tend to confuse rather than

to enlighten the jury. It is said that scholastic attempts to explain the meaning of such words, which are more easily understood than explained, are liable to lead such men as commonly make up our juries to think that the ordinary processes of reasoning, by which they are accustomed to come to conclusions in the ordinary affairs of life, are not suitable to the jury room in a criminal case, but that some other process of reasoning is to be adopted which they are to gather from the language of the trial judge, and that they are thereby really weakened in their ability to come to a just conclusion; that it would be better to leave them to exercise their own intelligence in regard to language so plain that it is not easy to make it plainer by explanation. Mr. Justice Newman said, in *Hoffman v. State*, 97 Wis. 576: " It needs be a skilful definer who will make the meaning of the term [beyond a reasonable doubt] more clear by the multiplication of words," while the writer expressed the view in *Emery v. State*, 101 Wis. 627, that the due administration of justice in many cases requires a careful explanation of the term to be given to the jury, and that without it justice is liable at times, through ignorance, to be defeated, and the efficacy of the law to protect society, and its administration by courts, discredited. In *State v. Sauer*, 38 Minn. 438, Mitchell, J., expressed the opinion that ' most attempts at explaining the meaning of a " reasonable doubt " are made by the use of expressions that themselves need explanation more than the term sought to be explained by them, and that the better way is to omit such attempts, but that if such attempts be indulged in it would be better to adopt those definitions that have received general approval by courts.' In *People v. Stubenvoll*, 62 Mich. 329, Champlin, J., speaking for all the members of the court, said: " We do not think that the phrase ' reasonable doubt ' is of such unknown or uncommon signification that an exposition by the trial judge is called for. Language that is within the comprehension

of persons of ordinary intelligence can seldom be made
plainer by further defining or refining. All persons who
possess the qualifications for jurors know that a doubt of
the guilt of the accused, honestly entertained, is a reasonable
doubt." In Judge Thompson's work on Trials (vol. 2, § 2463),
it is said that "all the definitions are little more than meta-
physical paraphrases of an expression invented by the com-
mon-law judges for the very reason that it was capable of
being understood and applied by men in the jury box."
Many more instances might be given where judges of ap-
pellate courts and text writers have discouraged all attempts
at explanation of what is a reasonable doubt, from the stand-
point of a juror. Nevertheless the fact remains that trial
judges, at least in important criminal trials, generally take
great pains to explain the term so that the commonest under-
standing can grasp its meaning. The practice in that re-
gard has grown up from frequent observations of the neces-
sity of it. It is considered here that it is proper in all cases
to make a careful explanation of the term, and that where
the prosecution relies wholly on circumstantial evidence it
is the better practice to do so, taking the utmost care, how-
ever, to use only expressions that have been approved, par-
ticularly by this court. No better illustration that the term
is not as easily understood as suggested in some of the cases
referred to, or of the care that should be exercised in explain-
ing it, need be given than the failure of Mr. Justice CHAMP-
LIN to correctly explain the term after declaring that no
explanation was needed. He stated that all persons quali-
fied as jurors know that an honest doubt is a reasonable
doubt. In the first place it is by no means certain that all
jurors will be intellectually qualified for their duties with-
out instruction; and again, clearly, every honest doubt is
by no means a reasonable doubt. A doubt, however honest,
may be, and often is, very unreasonable. From the stand-
point of a juror, in considering a case on the evidence, a

doubt however honest is not reasonable unless based on reason and common sense as applied to such evidence. It is considered that, in this case, the better practice would have been to have given to the jury the explanatory instruction requested, but inasmuch as the subject was covered by clear language in the general charge, the refusal was not reversible error. *State v. Martin*, 30 Wis. 216; *Allen v. U. S.* 164 U. S. 492; *Harris v. U. S.* 8 App. Cas. (D. C.), 20; *Stevens v. Comm.* (Ky.), 45 S. W. Rep. 76; *Taylor v. State* (Tex. Cr. App.), 42 S. W. Rep. 285; *Johnson v. State* (Tex. Cr. App.), 45 S. W. Rep. 901; *State v. Hamilton*, 57 Iowa, 596; *State v. Ruthven*, 58 Iowa, 121; *Comstock v. State*, 14 Neb. 205; *State v. Hayden*, 45 Iowa, 11; *State v. Glass*, 5 Oreg. 73.

The following instructions were requested and refused:

" (1) If you have a reasonable doubt as to these being the remains of Peter F. Nelson, or if you have a reasonable doubt as to whether the deceased came to his death at the hand of the defendant, then, and in each case, it is your duty to acquit.

" (2) The fact that the crime has been committed and the fact that this defendant committed that crime, must be proved independently of each other and beyond a reasonable doubt; and circumstances not tending to prove the commission of the crime, but tending to prove the guilt of the defendant, provided the crime has been committed, cannot be considered by the jury in considering whether or not the deceased came to his death through criminal means.

" (3) If the jurors believe that the evidence upon any essential point in the case admits of the slightest doubt consistent with reason, the defendant is entitled to the benefit of the doubt and should be acquitted."

Also, in substance: The law presumes the accused to be innocent until his guilt is established by the evidence beyond a reasonable doubt, to the satisfaction of each and every one of the jurors. The presumption of innocence should be

acted upon by you throughout the whole trial unless so overcome by evidence as to show the guilt of the defendant beyond a reasonable doubt. You cannot legally convict upon the preponderance of evidence or upon suspicion, however strong, or by any matter outside of the evidence produced in court.

It is sufficient to say as to each of the requests mentioned that it was covered by the general charge. In order to have carried home to the minds of the jurors with greater distinctness the full sense of the general expressions used regarding the term "reasonable doubt," and the "presumption of innocence," considering the gravity of the case and the nature of the evidence upon which it rested, it would have been a better administration of justice to have given some, at least, of the instructions requested, particularly 1 and 2. It is always best in the trial of so serious a case as this, where all there is of value in life is at stake on the one hand, and the most important interests of the people as a whole are at stake on the other, when an instruction is requested covering a vital question in the case, which in the judgment of the attorneys representing the accused person will more fully convey to the minds of the jurors a correct rule of law in regard to such question, and which is clearly more specific, than that of the general charge, to either embody it in such charge or to give it sepearately; but a failure to do so, when such charge is full upon such question, in language reasonably clear to men of ordinary comprehension, cannot be considered reversible error. Here the jury were told that the accused was not called upon to prove his innocence, but that the state was required to prove his guilt beyond a reasonable doubt, and that each and all of the jurors, before rendering a verdict of guilty, were required to come to a conclusion from the evidence produced in court in accordance therewith beyond a reasonable doubt, and as to each and every material thing set out in the in-

formation, and that guilt was established by such evidence to the exclusion of every other reasonable hypothesis, and that they were required to be unanimous in their final conclusion in that regard when rendering a verdict of guilty, and not to so conclude until the presumption of innocence in favor of the accused was overcome to their satisfaction by credible evidence, with the degree and certainty mentioned. Such instructions must have conveyed, reasonably, to the minds of the jurors all that was sought by the requests rejected. It would have been well to have told the jury that the charge contained in the information included, first, the death of a human being, second, that the death was produced by criminal means, third, that the person supposed to have been murdered was Peter F. Nelson, fourth, that the accused was the guilty party, and that each fact was required to be established independently of any other fact, and that each and all of them, and every evidentiary fact necessary to the existence of either of them, should be established beyond a reasonable doubt and so as to exclude to a moral certainty, or beyond a reasonable doubt, every reasonable hypothesis inconsistent therewith (*Kollock v. State*, 88 Wis. 663), in order to justify a conviction; and that it was the duty of the jurors to base their conclusion as to each of such facts on the evidence and the evidence alone produced on the trial tending to establish it. It is by no means clear but that instructions along that line would have been more clearly understood by the jury than the general statement that it was essential to a conviction that the state should establish by the evidence each and every material thing set out in the information beyond a reasonable doubt and so as to exclude every reasonable hypothesis inconsistent with guilt. But it is not possible for the jury to have acted in this case upon any other theory than that they were required to find, in order to convict, that the remains found were those of a human being, that he came to

his death by a criminal means, that such human being was Peter F. Nelson, and that plaintiff in error was the guilty party, and that those facts were all "matters contained in the information."

The court instructed the jury as follows: "The state has offered in evidence certain alleged facts and circumstances tending to contradict or explain the evidence of defendant, as follows: That the defendant has not proven that the shoes and pantaloons said to have been found with the remains were not the property of said Nelson; that the defendant's testimony as to several material matters," mentioning them, "has not been corroborated." We must admit that we are unable to discover what was in the judicial mind in giving such instructions, and no help in that field has been furnished by the learned attorney general. We have read the language of the trial judge, and re-read it, and the more study put upon it the more obscure the meaning of the language has become. "The state has offered in evidence certain alleged facts and circumstances tending to explain or contradict the evidence of the defendant; that the defendant has not proven that the shoes and pantaloons said to have been found with the said remains were not the property of the said Nelson." We will not attempt to explain or discover what idea such language was intended to convey, or that of the other language to which we have referred in the same connection. The expressions seem to be misleading and inaccurate throughout. The only way they could be passed over as not prejudicial would be to hold that the meaning, whatever was intended, is so obscured that neither it nor any other is likely to have been conveyed to the minds of the jurors, and to support that view there is much reason. But it is more likely that the jury may have received the impression that the burden of proof, by reason of some positive evidence of identification of the shoes and pantaloons, was cast upon the defendant and that he was required to prove that they were not the property of Nelson, and that the testimony of the ac-

cused on the various other matters mentioned was not to be taken as true unless corroborated. In that view the instructions were erroneous and prejudicial in a high degree. Obviously, the burden of proof was not at any point in the case shifted from the state to the accused. It rested on the prosecution from the beginning to the end of the trial, and if, taking the evidence of the accused, whether corroborated or not, with all the other evidence produced, whether bearing on a fact in issue or an evidentiary fact sought to be established, a reasonable doubt was left in the minds of the jurors as to its existence, it was the duty of the jury to resolve that doubt in favor of the accused.

Further instructions were excepted to on the ground that they contained misstatements of the evidence and assumed the existence of facts which were in dispute, none of which exceptions seem to be sustained by the record. It is said that the court improperly told the jury that no one but Pugh, the banker, and *Buel* knew that Nelson had the money in his possession, because a policeman went to the bank with Pugh when he took the money from the vault. The record shows that Nelson remained in Pugh's house while the latter went to the bank accompanied by *Buel* and a policeman whose services were secured for that purpose, but that after the money was taken from the bank Pugh and *Buel* returned to Pugh's house; that the policeman did not accompany them back, and that when the money was paid over to Nelson only he, Pugh, and *Buel* were present. It is further said that the court instructed the jury that Nelson did not leave the country immediately after receiving the money. The record shows, however, that what the court said was that evidence had been produced tending to show that instead of Nelson leaving the country immediately after obtaining the money, according to his expressed intention to the banker who paid it to him, he went into the country. That was true according to the undisputed evidence.

There are some other matters of which complaint is made,

but none that appears to be of importance except this: At the close of the evidence the court directed the attention of the jury to a particular part of the evidence, and said: "*It is perhaps hearsay, and that and all other evidence of a hearsay character, whether objected to or not, is now stricken from the record and the jury are directed to disregard it.*" That is called to our attention as a cause for reversal, but it does not appear that any exception was saved in regard to it. That it was error of a most serious character seems plain, though it is not a cause for reversal because a proper exception was not taken. Since the case must go back for a new trial it is deemed proper to refer to the matter so that such an error may not occur again. If there had been a jury of lawyers in the box they could not have complied with the judge's direction with unanimity. What is hearsay and what is not hearsay is not always easily determinable. Again, not all hearsay is inadmissible as evidence. Such a sweeping direction given to the jury, leaving them to determine what evidence to reject, is without precedent probably in the history of judicial trials reported in the books. If any such a proceeding were sustainable, the trial court could admit any kind of evidence and then clear the record at the close of the trial by a general order striking out all the evidence that was subject to objection by either party for any cause and a general direction to the jury to consider what was left. That practice would obviously save trial judges much mental labor and anxiety, but the administration of justice would be sadly defective.

It is considered that we have now referred to each of the numerous matters brought to our attention by the plaintiff in error that is material or that will be liable to arise on another trial. The conclusion is reached that because of the errors committed, to which we have referred, injustice has been done the plaintiff in error, and that the judgment must be reversed. A person circumstanced as the plaintiff

in error was is entitled to a fair trial according to the law of the land and the settled practice of the courts. That is the right of every person accused of crime and it should be awarded with the utmost strictness in a case of this importance. That right is just as sacred and to be just as fully guarded in one case as in another, no regard being had to the importance or significance of the accused as a member of society.

*By the Court.*— The judgment of the circuit court for Sawyer county is reversed, and the cause is remanded to such court for a new trial, for which purpose the warden of the state prison is directed to deliver the plaintiff in error, *Eugene Buel*, to the sheriff of such county, who is directed to safely keep the said *Buel* in his custody until discharged therefrom or as otherwise ordered according to law.