El Pueblo de Puerto Rico, demandante y apelado, *v.* Juan Ramón González, acusado y apelante.

Núm. 8228.—*Sometido:* Diciembre 19, 1940. *Resuelto:* Enero 29, 1941.

*Edgar S. Belaval,* abogado del apelante; *Hon. Procurador General George A. Malcolm, R. A. Gómez, Fiscal del Tribunal Supremo,* y *Luis Negrón Fernández, Fiscal Auxiliar,* abogados de El Pueblo, apelado.

El Juez Presidente Señor Del Toro emitió la opinión del tribunal.

En noviembre 28, 1938, el fiscal del distrito de San Juan formuló acusación contra Juan Ramón González, José Alberto Muriel y Mariano Rosario Centeno por asesinato de Juan Santa, perpetrado en Loíza en la noche del 9 de octubre anterior.

González pidió que se le juzgara separadamente y celebrado el juicio el jurado lo declaró culpable de asesinato en primer grado y la corte le impuso le pena de reclusión perpetua.

Apeló y señala en su alegato siete errores como cometidos por la corte sentenciadora 1, al desestimar su moción de especificaciones; 2, al permitir su identificación en forma improcedente; 3 y 4, al permitir que en el juicio se declarara sobre actos y manifestaciones de Álvaro López y un tal Pascual; 5, al permitir que el fiscal llevara a conocimiento del jurado una declaración que no estaba en evidencia; 6,

al apreciar la prueba, y 7, al declarar sin lugar la moción de nuevo juicio.

Tras un estudio detenido de los autos y de los alegatos nos sentimos obligados a revocar la sentencia apelada por haberse cometido el quinto de los errores señalados y como consecuencia del mismo el séptimo.

El dicho quinto error se formula en el alegato textualmente como sigue:

"V. Erró la Honorable Corte de Distrito de San Juan al permitir la actuación incorrecta del Fiscal, trayendo éste a conocimiento del jurado una declaración que no estaba en evidencia."

Aparece de la transcripción de la evidencia que habían declarado los testigos de cargo Antonio Navas, cirujano que practicó la autopsia de Juan Santa; José Ruidíaz, dueño de la tienda cerca de la Central Canóvanas que quedó al cuidado de Santa y frente a la cual estaba su cadáver; Luis Vélez, con quien se encontró José Alberto Muriel y le preguntó por el acusado, en la noche del suceso; Álvaro López, a quien Vélez preguntó por González a instancias de Muriel; Epifanio Díaz, que en la noche del 9 de octubre, 1938, vió corriendo al acusado cerca de la tienda de Ruidíaz; Félix Santiago, que esa noche pasaba con una vaca por allí y vió que detrás de la tienda de Ruidíaz el acusado, Mariano y un moreno tenían empuñado a Santa; Francisco Hernández, que oyó conversar la misma noche al acusado con Mariano Rosario Centeno en el cuarto de éste a donde iba a dormir el acusado, pareciéndole que instigaba a Mariano a que le entregara algo; Antonio Cruz, vendedor de piraguas, a quien Muriel en la noche de autos y en la plaza de Canóvanas le preguntó por el acusado; José Calderón, chófer que condujo en la parrilla de su carro, la repetida noche, al acusado y a su acompañante, una persona trigueña, de patillas, desde Canóvanas hacia la central, viéndolos tirarse antes de llegar e irse corriendo, y Antonio Torres que vió al acusado en

Canóvanas, como a las siete y media y luego como a las diez y media.

También aparece de la transcripción que ya habían declarado los testigos de descargo Francisco Torres, Carmen Méndez, Gerarda Flores, Pablo Rojas, Gabriel Benabe, Francisco Vázquez, Isabelo Fuentes, Quintina Fermaint, Amado López, Nicasio Esquilín, Ezequiel Ortiz, Eduardo García, Felipe Hernández, Ricarda Hernández, Justa Rivera, e Inés Dávila, todos en relación con la circunstancia de haber visto al acusado en la plaza de Canóvanas, donde se celebraban fiestas patronales, alrededor del tiempo en que el crimen fué cometido, y que el fiscal repreguntaba al acusado, cuando ocurrió lo que sigue:

"P.—¿Usted se supuso que cuando Antonio el heladero le dijo que Muriel lo estaba buscando era para comunicarle una noticia buena para usted y sin embargo cuando la policía le preguntó usted le dice 'Muriel estuvo por aquí y es un hombre peligroso'?

"R.—Antonio el heladero me dijo que Muriel me estaba buscando y que estaba con un pantalón azúl, una camisa azúl y un sombrero de fieltro.

"P.—¿Por qué fué que usted le dijo a la policía y levantó sospechas sobre el crimen sobre José Alberto Muriel y sin embargo cuando Mariano Rosario le imputó el crimen entonces usted no dijo nada sobre Mariano Rosario sino que insistió sobre Muriel?

"Defensa: No ha habido evidencia ninguna de que Mariano Rosario haya declarado nada del crimen. Sobre eso no ha habido nada en la declaración del testigo.

"Fiscal: Estoy tratando de impugnar la veracidad del testigo en el sentido de que como él ha relacionado sus actividades en relación con la noche del crimen, estoy yo sentando las bases para poder impugnar su declaración.

"Sr. Juez: Vamos a preguntarle primero al testigo si Mariano Rosario le imputó en su presencia el crimen, si es que Rosario se la hizo. Si el acusado niega, no se le puede hacer más preguntas sobre eso.

"Defensa: Me opongo a cualquier pregunta sobre si Mariano Rosario le imputó el crimen a José Ramón González.

"Sr. Juez: Yo le voy a hacer una pregunta al acusado.

"Sr. Juez: P.—¿Mariano Rosario le imputó a usted que usted había cometido el crimen ese?

"R.—Nada.

"P.—¿Mariano Rosario en presencia suya dijo que usted había cometido ese hecho?

"R. En presencia mía, no.

"Fiscal: P.—¿Usted recuerda haber estado en mi oficina y recuerda que allí Mariano Rosario, delante de usted y delante de José Alberto Muriel, le dijo a usted y describió la participación suya en el crimen?

"R.—La participación del crimen no la dijo.

"P.—¿Es cierto o no que Mariano Rosario dijo delante de usted y delante de José Alberto Muriel que él, Mariano Rosario y usted habían salido de los cuarteles de la Central y se habían encontrado con Muriel y fueron a la tienda?

"R.—No recuerdo si lo dijo.

"Defensa: Nos oponemos a esas preguntas.

"Sr. Juez: La corte va a permitir la pregunta porque se está repreguntando.

"Defensa: Tomamos excepción.

"P.—¿Lo cierto es que en esos momentos usted levantó sospechas sobre José Alberto Muriel?

"R.—No levanté sospechas, sino que le dije al policía que ese hombre había preguntado por mí.

"P.—¿Lo cierto es que usted no dijo nada sobre Mariano Rosario?

"R.—No sé nada de eso.

"P.—¿Usted recuerda que yo mandé a buscar a usted, a Mariano Rosario y a José Alberto Muriel?

"R.—No, señor. Yo no tengo que declarar nada más.

"Fiscal: La corte dirá si el testigo está obligado o no a declarar.

"Defensa: Yo mantengo que la pregunta del Fiscal es inadmisible.

"Sr. Juez: La corte resuelve que la pregunta del Fiscal es admisible.

"Defensa: Tomamos excepción.

"Fiscal: Pues, nada más con el testigo."

Terminó su prueba la defensa y en "rebuttal" el fiscal se limitó a introducir al testigo Luis Villalobos cuya declaración versó únicamente sobre el hecho de que en la plaza de Canóvanas no había reloj público. Y se dió por terminada la práctica de la evidencia.

No es posible admitir que a título de contradecir el testimonio de un testigo se lleve por el fiscal a la mente del jurado la impresión de que existe contra el acusado cierta prueba de su culpabilidad, cuando en el récord no hay antecedente alguno que lo justifique y cuando luego ni siquiera se intenta lo más mínimo en relación con la anunciada contradicción.

En su alegato la defensa sostiene que las manifestaciones de Rosario Centeno a que se refirió el fiscal, de haberse hecho, no hubieran podido admitirse por sí mismas en evidencia porque lo hubieran sido después de terminada la complicidad, porque no se demostró que fueran hechas en presencia del acusado y porque no se probó que el acusado con su silencio hubiera asentido. Además porque tampoco hubieran podido admitirse para impugnar la declaración del acusado actuando como su propio testigo porque no habían sido objeto del interrogatorio directo, porque no impugnaban de hecho su veracidad, porque de existir, habían sido voluntariamente suprimidas por el fiscal y porque en todo caso hubieran sido prueba directa, inadmisible en el turno de la refutación. Y por último porque se fundaban en prueba inadmisible por sí misma y por la forma incorrecta en que se introdujeron asumiendo la existencia de hechos que no estaban en evidencia.

No seguiremos al apelante en todos los fundamentos que expone para sostener su señalamiento de error. Nos detendremos únicamente en la consideración del último, o sea sobre la forma en que las supuestas imputaciones de Centeno se introdujeron en el proceso.

En el caso de *Buel* v. *State,* 80 N. W. 78, 83, de la Corte Suprema de Wisconsin, en el que se revocó la sentencia condenatoria y se ordenó la celebración de un nuevo juicio, el Juez Marshall, hablando por la corte, se expresó así:

"La administración de justicia exige que el poder discrecional de las cortes sentenciadoras no sea circunscrito dentro de límites demasiado estrechos, pero a su vez requiere que se le fije un límite que impida que en el curso de un proceso pueda crearse determinado prejuicio especialmente en casos importantes como éste, que pueda llevar al jurado a fijar los hechos sobre base que no sea la evidencia legítimamente producida en corte. Resulta claro que se traspasó tal límite al permitir que se extendiera el contrainterrogatorio en cuestión hasta el extremo que se llevó. Una cosa es el formular honradamente repreguntas con el fin de desacreditar a un testigo y otra muy diferente el hacer preguntas a un testigo que es parte en el proceso especialmente en un caso criminal grave, con el propósito de perjudicar su causa ante los ojos del jurado y hacer creer a éste que el testigo, dada su mala reputación, pudo haber cometido el delito imputádole. La lectura de las preguntas en cuestión lleva a la conclusión inevitable de que el fiscal no tenía la menor idea de que prueba podría derivarse de las materias que implicaban. Decimos 'implicaban' porque el hacer las preguntas directas en la forma en que se formularon implicaba en cierto grado que el examinador poseía información en que basaba sus preguntas, y aunque las contestaciones fueron negativas, el mal efecto de las insinuaciones producido por las preguntas no fué ni pudo ser totalmente borrado de las mentes de los jurados. Es inútil referirse a autoridades sobre la materia. Los tratadistas y los casos ya resueltos generalmente coinciden al efecto de que mientras el contrainterrogatorio se conduzca con razonable imparcialidad, a fin de comprobar la credibilidad de un testigo, el mismo es permisible, pero que desde el momento en que se formulan preguntas sobre hechos relacionados con la reputación del testigo, que son irrelevantes a los que están en controversia, para cualquier fin que no sea impugnar su credibilidad, o que manifiestamente no guarden relación con la credibilidad, se abusa del derecho a repreguntar, y al objetarse, su ejercicio deberá circunscribirse dentro de límites legítimos. Whar. Ev., secciones 473, 477, y notas."

Este caso es aun más fuerte. A virtud de la acusación, el jurado quedó enterado de que el crimen se imputaba al acusado como cometido en unión de Muriel y Centeno y la evidencia practicada tendía a demostrar la muerte violenta de Santa y a reunir de modo sospechoso al acusado con Muriel y Centeno alrededor y en el sitio del suceso, habiendo declarado un testigo, Félix Santiago, que los tres "tenían a Juan Santa empuñado."

Bajo esas circunstancias dejar caer sobre la conciencia del jurado a virtud de las repetidas preguntas no sólo del fiscal si que del juez el hecho de que Centeno había declarado ante el fiscal y en presencia del acusado imputando a éste la comisión del crimen, es algo que va más allá del radio más amplio y liberal que pueda fijarse para las repreguntas y que necesariamente tuvo que dejar una huella profunda en la mente del jurado en cuanto al resultado final de la escena descrita por el testigo Santiago, que parece especialmente calculado por el fiscal con la ayuda consciente o inconsciente de la corte para producir tal impresión. Y admitir como buena esa práctica sería destruir en sus cimientos nuestro sistema de enjuiciamiento criminal.

Nuestra ley orgánica—artículo 2 de la Ley Orgánica para proveer un gobierno civil para Puerto Rico, y para otros fines, aprobada en marzo 2, 1917—garantiza el derecho que tiene todo acusado en un proceso criminal a carearse con los testigos de cargo y prescribe que ninguna persona será considerada responsable de un delito sin el debido proceso de ley.

Aquí al introducirse en la forma subrepticia en que se introdujo el testimonio de Centeno, se privó al acusado de su derecho a carearse con el testigo, castigándosele en su consecuencia sin el debido procedimiento legal. La sentencia condenatoria dictada de tal modo no puede subsistir.

*Se declara con lugar el recurso, se revoca la sentencia apelada y se ordena la celebración de un nuevo juicio.*