WEISENBACH, Plaintiff in error, vs. THE STATE, Defendant in error.

*January 30—February 16, 1909.*

*Criminal law: Assault with intent to kill: Conspiracy: Trial of one conspirator: Opening statement: Evidence: Resistance to arrest: Previous threats: Submission of lesser degrees included in charge: Instructions to jury: Intent: Presumptions.*

1. If two persons assault another with design to feloniously take that other's life, and the claim of the prosecution is that such persons acted pursuant to a conspiracy, having for its purpose the offense attempted in aid of a further general purpose, and

only one is placed on trial who denies being one of the two, and the identity of the other is established—all the circumstances of the conspiracy, and the various steps in its consummation tending to show motive for participation therein of the one on trial and to identify him as having been the participant and the general intent of such participation, may properly be given in evidence.

2. In the situation mentioned it is proper to state to the jury in opening the case on the part of the prosecution all facts the state expects to prove, as to the existence of the conspiracy, the connection of the accused therewith, particularly at the time of the offense, and to offer all legitimate evidence showing such circumstances, so far as they tend to establish guilt of the accused.

3. In such a situation, the fact that one participant has not been apprehended, does not militate, upon the trial of the other, against showing all the facts regarding the absent one bearing on the criminality of such other.

4. If a person, about to be apprehended as guilty of having committed a criminal offense, resists arrest, that may properly be established upon his trial as bearing on the probability of his guilt and given such weight by the jury as they may think it is entitled to under all circumstances.

5. If an attempt be made to arrest a person upon a charge of his having committed a criminal offense, and he successfully, by threats or intimidation, prevents being apprehended, and is informed that he will be visited later by a force sufficient to secure his submission, and he evinces a disposition to resist in such event, and upon a new attempt the officers are resisted by such person and a comrade, acting in concert with him, and to the extent of a claimed design to take the lives of such officers,—proof of the previous occurrence and threats are legitimate as to the intent of such resistance.

6. If a person is charged with a homicidal offense of a high degree, including lesser degrees, the case need not be submitted to the jury in any aspect other than such as there is evidence in some reasonable view to sustain.

7. In the trial of a person accused of having committed a homicidal offense of a character including a lesser offense, the court should instruct the jury as to every offense included in the charge established in any reasonable view by the evidence.

8. In the circumstances last mentioned, failure to charge as to any particular grade of offense, no proper request being submitted therefor, is not harmful error.

9. In such circumstances, an instruction requiring conviction of the higher degree or acquittal, is favorable rather than harmful to the accused.

10. A requested instruction, embodying a correct rule of law but not applicable to the facts of the case, may properly be refused.

11. In submitting a cause to a jury involving a charge of assault with a dangerous weapon with felonious intent to take human life it is proper to instruct the jury that a man is presumed to intend the natural, probable, and usual consequences of his act, that being given so as to indicate it is not conclusive; only an evidentiary circumstance, to be considered in connection with the legal presumption of innocence and all the evidence bearing on the issue.

12. The fact that, in the given case, the reasonably to be expected result, as the usual and probable consequences of the act charged, did not occur, does not preclude giving to the jury the rule as to the inference of fact arising from the deliberate act

[Syllabus by MARSHALL, J.]

ERROR to review a judgment of the circuit court for Chippewa county: A. J. VINJE, Circuit Judge. *Affirmed.*

Plaintiff in error was duly convicted of the crime of assault with intent to murder. Exceptions were saved requisite to present for review the questions discussed in the opinion. The facts are there indicated, so far as necessary to an understanding of such questions.

*W. H. Stafford,* for the plaintiff in error.

For the defendant in error there was a brief by the *Attorney General, F. L. McNamara,* district attorney of Sawyer county, and *J. E. Messerschmidt,* assistant attorney general, and oral argument by *Mr. McNamara* and *Mr. Messerschmidt.*

MARSHALL, J. The charge was that the accused, upon a particular day and at a particular place named, while armed with a deadly weapon, to wit, a rifle, feloniously assaulted five persons, named, with intent to murder them.

The general claim of the state was this: John Dietz resided on the banks of the Thornapple river in Sawyer county, Wisconsin, some sixty miles by the nearest usable traveled way from the railroad station at Hayward, the county seat, and in a wild and substantially uninhabited country; miles beyond

the termini of public highways, and reached only by traveling through forests on rough roads, used principally by lumbermen, and passable, only with some difficulty, at the season of the year when the occurrence in question happened. There had occurred difficulties between him and a lumber company respecting conflicting claims as to property rights, leading to the commencement of actions, criminal and civil, against him, and his defying the officers of the law, refusing to submit to the jurisdiction of the courts, and insisting upon vindicating his claims by force to the extent of standing off officers of the law sent, in due course, with papers to serve on him and warrants for his apprehension, using deadly weapons for that purpose and evincing a determination to use them to kill rather than submit to the laws of the state as administered by its courts. Apprehending repetition of an expedition in force to arrest him, he associated the accused with him for the purpose of resisting the officers, and to the extent of killing them. On the 7th day of May, 1904, William Giblin and William Elliot, two deputy sheriffs of Sawyer county, departed from Hayward on an expedition to arrest Dietz, having a bench warrant, because of a previous defiance of the authority of the court, and a criminal warrant for a serious criminal offense in connection with the matter referred to. The first day they reached a stopping place, some forty-six miles from the starting point, leaving seventeen miles or thereabouts to be traversed before reaching the Dietz home, the way being over substantially unfrequented roads, through forests and rough uninhabited country, as before indicated. The next day they resumed the journey, accompanied by two employees of the lumber company with which Dietz was at war, and an employee of the farmer with whom they passed the night. The destination for the day was the lumber company's camp, near the dam which had been the subject of conflict, and near the Dietz home. The lumber company employees were on a return journey to camp. The farm hand went to drive and

take care of the farmer's team which with his lumber wagon and tote rack was procured to make the balance of the journey. The lumber company had a team, which was hitched with the other one, making a team of four horses. The two company employees took the driver's seat and one of them did the driving. The two officers sat on bags of feed behind such seat and back of them was the farm hand. Traveling as indicated, armed with several guns, which however were not loaded, about 1 o'clock in the afternoon, at a point about three miles from the camp, Elliot observed a man hiding behind the stub of a tree, about fourteen feet from the road and to the rear, and called attention of his associates thereto. The man changed his position as the wagon proceeded, so as to keep the tree stub between him and range from the position of the men in the wagon. The wagon had not gone far, after the man was first observed, before he suddenly stepped into the open, instantly brought his rifle to his shoulder, yelled "Hands up, you sons of bitches!" and commenced firing. Instantly, after the first shot was fired, another man, armed with a rifle, stepped from hiding into the open, near the first one and, likewise, instantly commenced firing on the party in the wagon. Immediately after the first shot the horses broke into a run. The discharge of firearms continued as long as the receding party could be kept in range, many shots in all being fired. One bullet went through the farm hand's hat, just above the band, and he fell out of the wagon into the road. The men were recognized as Dietz and the accused, the former being the one who first commenced firing. Four bullets took effect in the wagon. One of the persons on the front seat was struck with two pieces of bullets, wounding him severely in the right forearm. He was struck also by a bullet which cut one of his suspenders below the buckle and grazed and left marks on his body. The party did not wait or go back for the farm hand. They went on, after regaining control of the horses, several miles to a logging camp away from the contemplated route

and made no further attempt to execute the purpose for which they started. After the firing ceased two men approached Giauque, the farm hand, ordering him at the point of Dietz's gun to throw up his hands. They were in attempted disguise by blackening their faces, to some extent, and turning under their hat rims. After some altercation, Giauque was forced to return on foot to his employer's home, the accused, by Dietz's direction, running him down the road with the pointed gun against his back and kicking him several times and otherwise abusing him, commanding him to run under peril of being so filled with shot that he could not run and having his head blown off. In the meantime the accused had picked up a second gun, a shotgun, which was secreted behind a log near the location he occupied when the party first discovered they had been ambushed. As Dietz gave directions to the accused, he started on in pursuit of the officers, saying he would take across so as to head them off and get another shot.

Though a subpœna was duly issued to procure the attendance of John Dietz at the trial he was not produced. So far as appears the trial court and the jury were left to imagine why the one who appeared to be the dominant figure, in this most serious offense, was not present to testify. That it was not because he could not be found, sufficiently appears from the evidence. That it was not because, being served, he in contempt of authority refused to obey, further appears by inference. There is left, as the only inference, that by the hostile attitude of Dietz the officer with the subpœna was unable to make service upon him, without such peril of personal safety that he would not incur it. This situation must be considered with reference to some occurrences on the trial respecting which complaint is made. There was no dispute in the evidence but that the condition of things suggested, leading up to the shooting, existed, and no dispute but that the circumstance of the shooting and what followed as claimed, actually took place. The sole claim of the accused was that

neither he nor Dietz was present at the time of the shooting nor participated therein.  He testified that he was with Dietz at his home from some time in the forenoon till after the time the incident complained of was closed.  There was evidence to the effect, directly or circumstantially, that he was Dietz's nearest neighbor; that they were almost daily associates; that he knew of the difficulty between Dietz and the lumber company and his attitude of defiance of the lawful authority of the state; that he was a single man, living alone on a homestead claim about a mile and a half from the Dietz home; that he was the possessor of a rifle and shotgun and was accustomed to do considerable work for Dietz and to be with him, armed on or in the vicinity of the dam; that on the morning after the shooting he drove two persons away who were approaching his cabin, by menacing them with his shotgun, having the idea, as he testified, of avoiding mixing up in the difficulty Dietz was in, and that on Monday after the shooting, at Dietz's request, he made a trip on foot to Phillips, a distance of forty-five miles, and obtained for him a stock of ammunition.

The foregoing somewhat lengthy statement of the state's claim, and the general character of the evidence in support of it, will suffice, without going into the evidence in detail. The claim made that the verdict of the jury is not supported by the evidence is without merit.  The evidence seems ample at all material points to warrant the conclusion the jury reached.

Numerous exceptions were saved to remarks made by the prosecuting attorney in opening the case, such as referring to the existence of litigation between the Chippewa Lumber & Boom Company and Dietz, and to the sheriff, meaning, obviously, one of the deputy sheriffs, having at the time of the shooting a warrant, among others, for the arrest of Dietz for an offense upon one of the lumber company's employees, who was with the officers on the day of the shooting.  Also to ref-

erence to a circumstance that when officers, sent to apprehend Dietz, were eating their dinner at the lumber camp near the Dietz home, a shot was fired through the window, striking and breaking the arm of one Tracy. Complaint is made as to all such matters, and further, because the state asked two questions, which were not permitted to be answered, for the purpose of showing that when two deputy sheriffs went to arrest the accused he resisted by assault. Also because a question was asked of one of the deputy sheriffs, which was not permitted to be answered, as to whether the country adjacent to the Dietz place was not in terror of him and the accused, and questions, asked of another deputy sheriff, as to whether he did not inform Dietz that officers would be sent after him in sufficient force to capture him. Also because of a question to a witness called by the accused to impeach the statement of the witness Giauque, respecting whether John Dietz's brother William was not in strong sympathy with him in respect to the affair under investigation. Also because of a question, not answered, on cross-examination, put to a witness called to give the accused a good character as a peaceable and quiet citizen, as to whether he did not know the accused "was a member of John Dietz's outlaw gang." Also because the state's officer, in addressing the jury upon the evidence, said: "If John Dietz is that wronged man who has never committed a crime in his life, why isn't he here in the hall of justice?" to which objection was made because the officer who had been commanded to produce him upon a warrant could not get him. Whereupon such officer exclaimed in reply, "If you will admit that John Dietz is a lawless bandit that will be sufficient," to which counsel for the accused replied that, since all had been done that was practicable to secure the attendance of Dietz, the situation of the accused should not be prejudiced by referring to the circumstance of his absence. Also because the state's officer, in the course of his address, referred to John Dietz as an "anarchist" and the court declined to express any

opinion as to the correctness of the remark, saying: "The jury can take his characterization of Mr. Dietz for what they deem it worth." Further, because the state's officer said to the jury: "John Dietz is behind this case," and the court refused to sustain an objection thereto, saying: "Counsel is arguing from circumstances which appear in evidence and the jury can consider it as they deem proper." And lastly because the state's officer said to the jury: "The state has chased all over the state for witnesses for the defendant," and the court declined to express disapprobation thereof further than to say, in effect, that though the state had not, perhaps, chased all over the state for witnesses in behalf of the accused, it had responded to his every request in that regard.

We have thus grouped all of the complaints made as to unfair conduct of the trial on the part of the district attorney and his assistant. They are all of the same general character and fall by one general reason.

Counsel was radically wrong in the idea that the circumstances leading up to the shooting, claimed by the district attorney to show a motive therefor and such connection of the accused therewith as indicated that he was a guilty participant with Dietz in a purpose to defend his supposed rights by force against the officers of the law as well as against the private party, were foreign to this case. They were a legitimate if not a necessary part of it. If John Dietz was a guilty participant in the shooting, then the accused was, if he was the second man present. There is no escape from that. Really, though John Dietz was not on trial, he was the most significant figure in the affair. Therefore, all circumstances now narrated leading up to the astonishing situation of one man with neighborly assistance, including the accused as was claimed, carrying on successful warfare with a great state, defying its laws, its officers, and its courts, culminating in the battle in the woods which ended, as the jury believed, and had a right to believe, without any great loss of blood, owing to

want of deliberation and good marksmanship on the part of the accused and his associate and the distinction won by the officers of the law in the rapidity and success of their flight and their utter unpreparedness to meet the resistance they seemed to have anticipated they might meet before the expedition was over. John Dietz and his operations which so culminated were as much a part of the affair as participation of the accused therein. There was one single specific thing reaching from the origin of the trouble, furnishing motive for the attitude of lawlessness, through all the circumstances down to and inclusive of the final event, indicating intent to resist the administration of the law to the extent of taking of human life and participation of the accused in such intent. In the very nature of things, Dietz's name, his actions and operations could not properly have been kept out of the case. The history of the trial shows that the learned circuit court endeavored to do so up to the closing of the case to the jury, and, generally, in that respect, erred in favor of the accused rather than against him.

Perhaps it were better that reference to the shooting of Tracy had not been made. There was no evidence that Dietz did the shooting, or, if he did, that the accused participated therein, while if it had any connection with the particular offense, even as an evidentiary circumstance, it was quite remote. However, it was so consistent with the general state of things which resulted in the particular shooting, that we are unable to say that the district attorney did not honestly expect, when he referred to the matter, to introduce evidence in respect thereto, showing that it was a part of general warfare in which the accused was engaged and of which the shooting in question was a part and that it might be held competent, at least as bearing on the intent with which the firing on the officers occurred. Neither can we say but that the circuit judge might reasonably have supposed, at the time he ruled on the question, that, possibly, the circumstances re-

ferred to might be so connected with the case as to be entitled to evidentiary consideration. No evidence was offered in respect to the matter, which may have been because, since the court evinced a determination in the course of the trial to exclude everything, except what occurred at the time of the shooting, the district attorney thought it would be futile to offer the evidence. On the whole, we are unable to denounce the occurrence as involving harmful error, if error at all.

The interrogatories, suggesting that the officers sent to arrest the accused were resisted, assaulted, and injured by him, which the court would not permit to be answered, are very far from the rule in *Buel v. State,* 104 Wis. 132, 80 N. W. 78, condemning the asking of questions which are clearly improper, for the evident purpose of creating prejudice rather than to elucidate the truth. It is evident that the district attorney supposed it was perfectly proper for him to prove that the conduct of the accused at the time of his arrest was inconsistent with innocence, in that he resisted the officers, as on the former occasion, assaulting and injuring them, and well the attorney might so have thought, as it was not only his right to make such proof, if the facts warranted it, but it was his duty to do so, if the evidence was at hand, or reasonably obtainable. Counsel say the questions were asked to create a false impression. How are we to know that? The witness was not permitted to answer. If the questions, unanswered, tended to create a wrongful prejudicial impression, counsel for the accused took the method best calculated to promote that situation. If the truth were, that the conduct of the accused at the time of his arrest was consistent with innocence, the proper way was for counsel to have put no obstruction in the way of proving it. Not only was no harmful error committed in propounding the interrogatories, but they were perfectly proper and the ruling in favor of the accused was wrong. Conduct of an accused person, evincing a disposition to evade prosecution, and especially when it

goes to the extent of forcibly resisting arrest, is always considered an incriminating circumstance of more or less weight according to the circumstances, and proper to be considered by the jury. Wharton, Crim. Ev. (9th ed.) § 750.

The question asked of the sheriff of Sawyer county as to whether "the country was not in terror of those men," referring particularly to Dietz and his associate, perhaps had better not have been asked, though doubtless counsel honestly believed it was proper to show fully the attitude of John Dietz and his associates and the impression it had created on the people of the county, as bearing on the probable purpose of their ambushing the party on the occasion in question and the intent with which the shots were fired. It is pretty hard to draw an arbitrary line on evidence tending to establish a combination to commit an offense or to accomplish a general purpose, in aid of which a crime is committed, or such a line, particularly in such a case as this, respecting circumstances evidentiary of intent. The learned circuit judge, with the abundance of caution which characterized his conduct of the trial, refused to allow the question to be answered, but that does not even suggest that the asking of it was error. Had the court ruled the other way the field of competency is so broad that it is by no means certain the ruling would be condemned. However, we repeat, it were better that the question had not been asked and the jury left to infer the situation, such as it was, from evidence of circumstances bearing thereon.

It was by no means improper to show that just prior to the occurrence an officer had visited Dietz with papers for his arrest and failed to apprehend him, and admonished him that he would probably be called on by a force sufficient to secure his submission. The learned court was overcautious in ruling on that in favor of the accused. The fact, if it were a fact, that shortly before the occurrence in question the officers of the law were unable to apprehend Dietz and he was then

informed that a more efficient force would be out after him, and he informed the officer, in return, that the threatened new force would meet with efficient resistance, were evidentiary circumstances explaining the purpose of Dietz and his associate in ambushing the officers as they did. It gives significance to the tactics of striking the party in the rear, so as to have them at the disadvantage sought by an assassin of striking his victim unseen and cutting off retreat as well.

The question asked, on cross-examination, of the witness called as to the character of the accused, better not have been asked just as it was, but like many other questions of which complaint is made, it was not permitted to be answered, and like many of them it was proper, in the main, and might well have been modified so as to remove any objectionable element. The use of the term "outlaw" was a little harsh, yet we are not prepared to say, in view of the facts disclosed, that it was entirely unwarranted. The witness, having testified to the reputation the accused had as a peaceable citizen in the community where he had resided for five years preceding the trial, and there being evidence strongly tending to show that the accused was in fact an accomplice of John Dietz in criminally defying the law, it was competent to ask the witness, for the purpose of discrediting him, whether the accused was not reputed to be such an accomplice, and that was the effect of the question.

It were perhaps better that the colloquy which occurred respecting the absence of John Dietz from the trial, notwithstanding the importance of his presence, if the testimony of the accused was true, had been tempered a little different, yet we are unable to say it was not within the privilege of the prosecuting officer to say what he did. He was warranted in arguing from the evidence that Dietz was what he characterized him to be, and that the accused was his willing assistant on the occasion in question, and that the evidence which pointed to one as a criminal pointed just as certainly to the

other, if not more; that absence of the latter from the trial, under such circumstances as to suggest contempt and defiance of the law, was an incriminating circumstance.

We will not further pursue the discussion, in much detail, of the numerous matters we have grouped together. There is no harmful error discovered in any of them. In general, the district attorney showed commendable care not to drag illegitimate matters into the case. We cannot see any indication of intent at any point to merely create prejudice within the calls of *Buel v. State,* 104 Wis. 132, 80 N. W. 78. Whatever digressions there were from the highest standard of propriety were not harmful, nor do they merit any special criticism. They were fairly within the broad privilege of the attorney, suggested in *Fertig v. State,* 100 Wis. 301, 75 N. W. 960. As regards the court's rulings, the accused certainly has no ground to complain, as we have seen. They were, in the main, in his favor when they might well have been otherwise, and when they were not they were not prejudicially against him. In the final winding up of the case by counsel to the jury the court was at least excusable in allowing the state's attorney to argue from the evidence that John Dietz was an "anarchist," and "was behind the defense." As before indicated, his connection with the transaction could not have been kept from the jury rightly or at all. Neither could the fact be kept from them that the acquittal of one was highly important to the other, and that the latter's friends were interested in and prominent in the former's defense.

The court properly refused to submit to the jury the question of whether if the accused was guilty of any offense at all it was of a higher grade than assault and battery. True, under a charge of assault with any specific intent, the latter element and the former combined, making an offense of a higher degree than the element of assault alone, there may be a conviction of the lesser offense only, if such only is the grade of guilt, in the judgment of the jury, beyond a reasonable

doubt. That is elementary. The circuit court doubtless appreciated that and declined to charge the jury as requested, because in its judgment, in no reasonable view of the evidence, was the accused guilty only of assault and battery, or simple assault, if he participated in the shooting, as claimed by the numerous witnesses, and without contradiction, except by the evidence of the accused that he was not at the scene of the shooting, which the jury, of course, disbelieved and were well warranted in so doing.

In determining whether an instruction as to any lower degree of criminal offense, included within the one charged, should be given to the jury, the question is not solved by determining that the major includes the minor offense. Juries have no discretion in such cases. They cannot rightly convict of the lesser offense merely from sympathy or for the purpose of reaching an agreement. Conviction of the lesser degree must rest on evidence establishing the facts in that regard, and failing to establish the facts incident to a higher degree. So there must be the lesser offense included within the greater and there must be some reasonable ground on the evidence, in the judgment of the court, for a conviction of the former and not of the latter. *Hempton v. State,* 111 Wis. 127, 139, 86 N. W. 596; *Duthey v. State,* 131 Wis. 178, 182, 111 N. W. 222; *Montgomery v. State,* 128 Wis. 183, 197, 107 N. W. 14; *State v. McPhail,* 39 Wash. 199, 205, 81 Pac. 683; *State v. Bailey,* 31 Wash. 89, 71 Pac. 715; *State v. Wood,* 124 Mo. 412, 27 S. W. 1114. The law in this respect is well indicated by this language of the court in *State v. Wood, supra:*

"There was nothing in the evidence calling for an instruction on the lower grade for an assault to kill . . . and under such circumstances the court should not invite the jury to find for a lower grade than is made by the evidence."

We do not consider the assault, testified to have been committed on Giauque some moments after the shooting ceased

and the offense the accused was charged with having partici-
pated in was fully consummated, was included in such charge.
It was near to and closely connected with the shooting, yet
was sufficiently separate therefrom as not, properly speaking,
to be considered as included therein.

Under all the circumstances, it is the opinion of the court
that, conceding the accused was at the shooting and partici-
pated therein, as the jury found were the facts, there was no
reasonable escape from the conclusion that his act was more
than mere assault and battery. So the requested charge was
properly rejected. If the evidence would have warranted
conviction of any offense within the whole charge less than the
whole but greater than assault and battery, failure to submit
it was not harmful in a legal sense, because not requested.
*Cupps v. State,* 120 Wis. 504, 522, 523, 97 N. W. 210, 98
N. W. 546. Moreover, in such a case instruction requiring
conviction of the higher grade, or acquittal, is rather favor-
able than harmful to the accused. *Fertig v. State,* 100 Wis.
301, 75 N. W. 960; *Dickerson v. State,* 48 Wis. 288, 4 N. W.
321; *Winn v. State,* 82 Wis. 571, 52 N. W. 775; *Odette v.
State,* 90 Wis. 258, 62 N. W. 1054.

There has been no purpose in later years to displace the
rule laid down in *Dickerson v. State, supra,* and upon due
consideration and recognition of its want of harmony with
some authorities elsewhere, in *Winn v. State,* 82 Wis. 571, 52
N. W. 775, declared to be perfectly logical and too well
grounded in our jurisprudence to be doubted. It is not in-
consistent with the rule in *Hempton v. State, supra,* and sim-
ilar cases. In the *Hempton Case* the particular rule was rec-
ognized and affirmed. In the whole, the rule in homicide
cases is that the better practice is for the trial judge to care-
fully scrutinize the evidence with the greatest care, view it
in the most favorable light it will reasonably admit of from
the standpoint of the accused, and, whether requested or not,
submit the case to the jury on every phase of criminal homi-

cide to which such evidence reasonably applies.   Failure to submit on any such phase, if properly requested to do so, is harmful error, but failure, in case of there being no such request, is not harmful error.   Moreover, such failure, without such request, characterized by explicit instructions that unless the accused is believed from the evidence beyond a reasonable doubt to be guilty of the higher degree he should be acquitted,—if error at all, is error favorable to the accused.

Complaint is made because the court refused to instruct the jury as to the bearing of want of motive.   The request was to the effect that want of motive for a person to have committed the offense with which he is charged is a circumstance to be considered by the jury in connection with all other evidence in determining the issue respecting such charge.   That is correct in the abstract.   But it is not necessary for a court to submit to a jury a requested instruction merely because it states a correct rule of law.   Does the case on the evidence reasonably require the instruction?   That is the principal question, and unless the affirmative is true, rejection of the request is proper.   Here the court, doubtless, thought such an instruction could not reasonably cut any figure, since it could not have any perceptible effect on the question of whether the accused was present at the shooting or not, and if he were then the motive for what occurred is so manifest that the jury could not reasonably have come to the conclusion there was none.   Proof of motive is not indispensable to establish a criminal offense.   Absolute want of motive does not necessarily raise or leave in connection with the legal presumption of innocence a reasonable doubt as to guilt, since the crime, including the essentials of guilt, may be inferred from the act itself and consequences, if they are the natural and probable effect of the act.   *Cupps v. State, supra; Pointer v. U. S.* 151 U. S. 396, 14 Sup. Ct. 410; *Clifton v. State,* 73 Ala. 473; *McLain v. Comm.* 99 Pa. St. 86, 99.   In doubtful cases the evidentiary effect of want of motive may be of much

and perhaps controlling significance, and an instruction in respect thereto ought always to be given, and refusal to give it upon proper request would be harmful error; but where the evidence is such that motive is perfectly apparent to any one of common sense, or the offense is established with requisite clearness and the connection of the accused therewith as well by direct and positive evidence, an instruction on the subject of motive may or may not be given in the discretion of the court.

The requested instruction that a mere formal charge of, and placing one on trial for, a criminal offense is not evidence of guilt, was amply covered by the plain and full charge as to the presumption of innocence.

A requested instruction as to the burden of proof and the degree of certainty of guilt to warrant a conviction, was sufficiently covered in the general charge, and the same is true as to several other requests which need not be referred to in detail.

A request was made to instruct the jury to the effect that, in order to warrant a conviction, it is necessary for the state to prove by evidence beyond a reasonable doubt that the defendant maliciously and deliberately formed an intent to kill "one or more persons named in the information and that he with such deliberately formed intention" attempted to effectuate it. So far as that states good law it was included in the general charge. It was properly rejected for the iteration and reiteration of the words "deliberately formed intention," which are not used in our statutory offense of murder in the first degree, instead of the words "premeditated design," which are so used. *Cupps v. State,* 120 Wis. 504, 97 N. W. 210, 98 N. W. 546.

Complaint is made because the court said to the jury: "You are instructed that a man is presumed to intend the natural, probable, and usual consequences of his act." That is about as familiar a principle of law as we have. *Cupps v. State,*

*supra; Clifford v. State,* 58 Wis. 477, 17 N. W. 304. It is. not conclusive and was not so given to the jury. In close connection therewith the jury were carefully instructed on the subject of reasonable doubt and the legal presumption of innocence and were, in substance, told that, viewing the whole situation as disclosed by the evidence, unless they reached a conclusion beyond a reasonable doubt that the accused fired upon the party with a design to take human life, or his associate so fired with such intent with the knowledge and participation of the accused in his criminal act and purpose, they should acquit him. So the presumption from the act of shooting was given only its legitimate evidentiary effect, an effect rebuttable by other presumptions and circumstances, direct and circumstantial.

Had the instruction complained of been given in such a way as to lead the jury, reasonably, to believe that the act and purpose of shooting with the natural and probable result to destroy human life, necessarily, established, as a matter of law, the essentials of intent to commit the crime of murder; that the intent was not a fact in controversy to be established by evidence, the same as the act alleged to have been characterized by the intent,—the situation would be different. So the contention supported by numerous authorities that the specific design to take human life must be established by evidence and not left to depend upon a presumption of law, is beside the case. True, it is to be so established, but the natural inference of fact arising from the act is evidence of the purpose thereof, to be considered with all other evidence bearing on the question, and in no other sense was the instruction given.

The contention of counsel that the principle embodied in the instruction has no application except in case of the natural and probable consequences actually occurring, which has support in *State v. Dolan,* 17 Wash. 499, 50 Pac. 472, is illogical in the extreme. True, effectuation of the act

heightens the force of the inference, but is not indispensable
to its existence, from the very reason of the rule.   The infer-
ence arises from the element of "natural and probable,"
though the result which ought reasonably to have been fore-
seen as probable, may not have happened because of some cir-
cumstance perfectly consistent with the purpose that it should
happen.   To illustrate, suppose the accused fired twice, di-
recting his aim first to one of the party attacked and with fatal
result, and second to another without such result, could there
be any doubt but that the inference of intent would arise in
the latter as well as in the former instance?   The doctrine
laid down by the Washington court is quite novel.   An ex-
amination of the authorities relied on shows that they were,
as it seems, misapprehended.   In a later case, *State v. Ro-
mano,* 41 Wash. 241, 83 Pac. 1, where the consequence was
not death, the instruction condemned in *State v. Dolan, supra,*
was approved, while not applied, and a not very successful
attempt was made to distinguish the two cases.   The former
was substantially overruled.   A concurring opinion went
upon the ground that the early rule was bad law.   The false
logic of it was aptly illustrated by Justice RUDKIN, saying:
"I think the portion of the charge excepted to is a correct
statement of a familiar principle of law, and is applicable in
every case where the question of intent is involved." Citing
*Comm. v. Webster,* 5 Cush. 295; *Allen v. U. S.* 164 U. S.
492, 17 Sup. Ct. 154; 1 Greenl. Ev. § 18, and other authori-
ties.   Referring to the logic of his brethren, who omitting to
profit, as it appears, by the opportunity to return to a correct
rule, resorted to the doubtful method of distinguishing be-
tween situations where there is no substantial difference, he
said: "I do not care to indulge in any such refinements, but
vote for affirmance on the broad ground that the instruction
excepted to embodies a correct statement of the law as to any
and all of the crimes charged."

Some other criticisms of the charge are made, but it is the opinion of the court that they are not of sufficient merit to warrant more than this incidental mention.

This closes a review of all errors assigned with as much detail as seems required. Some matters have not been mentioned at all and others only in a general or incidental way, but all have received the study which the importance of the case would seem to demand. The case was ably tried by the court and by counsel on both sides, and, in our opinion, justice has been vindicated. The case developed a most astonishing situation, respecting successful defiance of the lawful authority of the state, which fully warranted the learned trial judge in strongly characterizing the accused and his confederate at the time of passing sentence as guilty, in addition to the offense charged, of a highhanded defiance of the law of the land equivalent to open war with duly constituted authority. That does not, as we view it, evidence prejudice on the part of the learned judge, and give color to the conduct of the trial as prejudicial to the accused. It was a deliberate judicial expression on the case as it appeared when ready for judgment, given after restraint, upon personal views, which had been very marked in favor of the accused, and when such restraint not only was no longer necessary, but the situation of having successfully defied the law, as appeared to the judge, could properly be pictured as a preface to the sentence to be passed, and a subject for reflection to any one concerned.

*By the Court.*—The judgment is affirmed.