DIETZ, Plaintiff in error, vs. THE STATE, Defendant in error.

*March 16—May 14, 1912.*

*Criminal law: Evidence: Other offenses: Murder while resisting ar-
rest: Intent: Previous acts and threats: Warrant: Instructions
to jury: Omissions: Waiver: Change of venue: Prejudice: Call-
ing in another judge: Right of accused to try his own case: Ap-
pointment of attorney.*

1. As a general rule, it is not competent in a prosecution for one
   crime to introduce evidence of other offenses; but where such
   other offenses directly tend to prove some material element of
   the crime under investigation, such as guilty knowledge or
   some specific intent, they may be shown.
2. Upon a prosecution for the murder, by shooting, of a deputy
   sheriff who, in an attempt to arrest the defendant under crim-
   inal warrants, had with other deputies, armed with rifles, sur-
   rounded and laid siege to defendant's home in a clearing
   in the woods, it was competent for the state, in order to nega-
   tive any claim that defendant acted in a good-faith defense of
   his home and family from attack by persons who appeared to
   be wrongdoers, and to establish that he had the criminal intent
   necessary to constitute murder, to show that he had frequently
   and uniformly during the preceding years made armed resist-
   ance to arrest and had threatened to shoot the officers on sight
   and that he would never be taken alive.
3. The fact that some of the acts of resistance to arrest were re-
   mote in point of time did not, of itself, render such evidence
   incompetent, especially where such acts were repeated year
   after year down to a recent time and were all apparently in-
   spired by the one purpose to resist the execution of legal
   process.
4. The evidence of defendant's previous acts and threats was ad-
   missible also to explain and justify the extraordinary display
   of force in the attempt to arrest him on the occasion in ques-
   tion.
5. Such evidence was not confined in its probative effect to the ques-
   tion of defendant's intent, but was admissible generally because
   it tended to prove a general design or system of which the
   shooting of the deputy on this occasion was simply an integral

part necessary to the successful consummation of the design or system.

6. Evidence that a loaded set gun and large bear traps were found at places where officers were likely to approach defendant's house, was admissible as tending to show preparation or design to make forcible and deadly resistance to arrest.

7. A criminal warrant upon which the officers were endeavoring to arrest the defendant at the time of the shooting in question was properly received in evidence to justify their armed approach to defendant's home.

8. The rule that, in the absence of any request by the defendant, failure to charge the jury as to certain matters or omission to submit certain degrees of crime is not error, is not strictly applied in this case, defendant having tried his own case without the assistance of an attorney.

9. The calling in of a judge of an adjoining circuit to try a case in which an affidavit of prejudice has been filed against the presiding judge, is a change of venue within the meaning of sec. 4680, Stats. (1898), providing that not more than one change of venue shall be awarded in any cause.

10. The evidence in this case is *held* ample to sustain the verdict to the effect that the shot which killed the deputy sheriff was fired by the defendant.

11. Every person *sui juris* who is charged with crime has the right to try his own case if he so desires, and the court would not *be* justified in imposing counsel upon him against his will.

12. At the opening of a trial for murder, defendant stated that. although he was able to employ an attorney and had had many applications for the position he preferred and intended to try the case without any attorney. There was nothing to indicate any lack of mental competency on his part, and in fact he managed his case with shrewdness and with knowledge and active assertion of his substantial rights, making due and timely objections to evidence and addressing the jury with fluency and force. He secured the acquittal of other members of his family who were tried with him, but was himself convicted upon ample evidence of his guilt. *Held*, that there was no error in failing to appoint an attorney to defend him.

Error to review a judgment of the circuit court for Sawyer county: A. H. Reid, Judge. *Affirmed.*

*John F. Dietz,* his wife, Hattie, and his son, Leslie, were

prosecuted for the murder of one Oscar Harp, and upon the trial of the case before the circuit court for Sawyer county in May, 1911, the wife and son were acquitted and *John F. Dietz* was convicted of murder in the first degree and sentenced to imprisonment for life. He prosecutes this writ of error to reverse that sentence.

It appears that in October, 1910, and for ten years or more previous to that time, *John F. Dietz* lived with his family upon a farm of 160 acres, owned by him upon a small stream called the Thornapple river in Sawyer county, and nine or ten miles from the railroad station called Winter. Most of the farm was cleared, but it was surrounded by heavy timber. The road from Winter opens into the clearing near the northwest corner thereof. The buildings on the farm are all log structures and consisted of a house, barn, and root house, the barn being the most northerly of the group and the house the most southerly. The barn is a two-story structure, the slopes of its roof being to the east and west, and the roof being covered with "shakes" instead of shingles. The river runs along the west side of the farm in a general northerly and southerly course. About 400 feet northerly from the barn there was a rise of ground referred to on the trial as the "lookout." About 500 feet easterly from the buildings were several piles of lumber with alleys between. In September, 1910, a criminal warrant was placed in the hands of Michael Madden, the sheriff of Sawyer county, commanding him to arrest *John F. Dietz* for assault with intent to murder one Bert Horrell on the 6th day of September, 1910. The sheriff had other warrants in his hands for the arrest of *Dietz* for other criminal offenses alleged to have been committed during previous years, and, after having formed a posse of more than twenty deputies, he approached the *Dietz* farm October 6, 1910, and surrounded it, the deputies being armed with rifles on account of previous occurrences referred to in the opinion. Attempts were made on October 6th and 7th to induce *Mr. Dietz* to submit to ar-

rest, but they failed, and on October 8th a formal siege of the buildings was inaugurated and many shots were fired by the deputies at the buildings, and it is claimed that the fire was returned by *Dietz* himself and by members of his family.    At about 11 o'clock in the forenoon Deputy Sheriff Thorbahn, who was in charge of the proceedings, directed a number of deputies (among whom was Oscar Harp), who were located some distance to the east of the lumber piles, to move forward across a cleared field to the shelter of the lumber piles.    They obeyed and proceeded toward the lumber piles on their hands and knees.    As they were so doing, three shots were heard and Harp was struck and killed by the first shot, while his companions reached the lumber piles.    The claim of the state was that the shot in question was fired by *Dietz* from the upper story of the barn through what was called a porthole in the roof, made by removing one of the "shakes" of which the roof was composed.    The claim of the defense was that this fact was not proven, and that it was entirely reasonable to suppose that one of the deputies stationed on the westerly side of the farm fired the shot.    All of the defendants declined to be defended by counsel, and neither of them was sworn as a witness.    The trial occupied about ten days.

*Maurice McKenna, J. E. Malone,* and *E. H. Naber,* for the plaintiff in error.

For the defendant in error there was a brief by the *Attorney General, Russell Jackson,* deputy attorney general, *S. J. Williams,* district attorney, and *V. W. James,* of counsel, and oral argument by *Mr. Jackson* and *Mr. Williams.*

WINSLOW, C. J.    The plaintiff in error (hereinafter called the defendant) claims error (1) in the admission of evidence, (2) in the instructions to the jury, and (3) in the denial of a new trial, and these claims will be discussed in the order named.

1. The evidence in the present case disclosed a most re-

markable transaction,—one which would seem almost incredible in a state where law and order have been long established, were the evidence anything less than conclusive. A citizen of the state, a man of at least some property and substance, a man with a wife and family of children, apparently a man of intelligence and quick perception, sets at defiance the officers of the law, retreats to his home, wages actual war with the state, and only submits to arrest after a human life has been snuffed out as one might snuff a candle. There was, of course, some reason for this unusual display of force on the side of the officers of the law and for this armed resistance on the part of the defendant. Sheriffs do not ordinarily proceed to make arrests with a score or more of deputies armed with rifles, nor do citizens ordinarily make fortresses of their homes and do battle with the duly constituted authorities of the state. A man who sees his home surrounded by armed men stealing from tree to tree and shooting to kill has a right, doubtless, to defend himself and his family by like methods, unless he knows that the purpose of the approach is rightful, and that he has only to submit to arrest by the official conservator of law and order to be entirely safe from violence. . Upon the trial of the present case the prosecuting attorneys doubtless realized the necessity of explaining and justifying the manner of the sheriff's approach, as well as the necessity of making it plain that defendant, in resisting arrest with firearms, was not acting in good-faith defense of his home and family from attack by persons who appeared to be wrongdoers, but rather in well understood defiance of the lawful execution of legal process. In order to accomplish this purpose a large mass of evidence was introduced by the state tending to show that on a number of occasions during the seven years immediately preceding the death of Harp the defendant had successfully resisted arrest on criminal warrants issued out of the state courts for various offenses, and had refused to permit service to be made upon him of injunctional

orders and other civil process issued out of the federal court; that upon most of these occasions he had threatened to shoot the officers, had proclaimed that none of them should take him alive, and had used his rifle in driving them from his premises. One of the most aggravated instances of resistance to arrest so introduced in evidence was that of May 7, 1904, when Sheriff Giblin and his deputies, armed with a bench warrant and a criminal warrant against the defendant, were ambushed on the road by two disguised men with rifles, one of the men being identified as the defendant and the other as one Weisenbach, a neighbor. For this offense Weisenbach was prosecuted and convicted, and the conviction affirmed by this court. *Weisenbach v. State,* 138 Wis. 152, 119 N. W. 843. Reference to the report of that case will show the details of the resistance to arrest on that occasion. It is not deemed necessary to go into the details of the various attempts to arrest the defendant which were related to the jury. None of them were successful. The officers of the law became thoroughly intimidated, and the unexecuted warrants remained in the hands of the various sheriffs, and were passed along as sheriff succeeded sheriff, becoming seemingly a part of the usual muniments of title to the office. Sheriff Madden received them on his accession to office, and they were still unserved when he received the warrant for the alleged assault upon Horrell in September, 1910.

The proof of these previous acts of resistance to the efforts of officers of the law to arrest the defendant was supplemented by proof that on the occasion in question, before the actual siege of the buildings was begun, Deputy Sheriff Thorbahn, who was in charge of the posse, sent a letter to the defendant, advising him to surrender, that resistance was useless, and that he would be treated right. It was further shown that upon the rejection of this warning, Mr. F. L. Gilbert, then attorney general of the state, accompanied by Col. O. G. Munson, private secretary to the then governor, Hon. J. O. David-

son, went to the defendant's house and had two long conferences with him and his wife, one on the 6th and one on the 7th day of October, in which conferences the defendant was urged to surrender himself, and was guaranteed a fair trial in a county and with counsel of his own selection. This guarantee was in writing, signed by the governor, and was left with him. In these conferences he was told of the whole situation, and that the officers had the entire place fully surrounded and would certainly take him by force. The attorney general in the last conference went so far as to propose that the criminal charges against all other members of his family, of which there were several pending, would be dismissed if he would surrender himself up. This offer was declined by the defendant, and he declined to consider the idea of surrender even in case all other criminal charges made against him were dismissed except the Horrell assault charge. No hostilities were begun until the day following the rejection of Mr. Gilbert's offers.

It is very evident that the evidence of the frequent and uniform armed resistance to arrest on the part of the defendant through the years preceding the occurrence in question, together with the evidence showing the unsuccessful attempts to persuade the defendant to peaceably submit on the 6th and 7th of October, go a very long way to explain the extraordinary occurrences of October 8th, and throw much light upon the mental attitude of the defendant at that time. Due and seasonable objections were made by the defendant to the evidence of the previous acts of resistance to arrest on the general ground that it is not competent in a prosecution for one crime to introduce evidence of other offenses. This rule is so well established that citation of authorities in its support is unnecessary, but certain exceptions to it are equally well established, namely, that where such other offenses directly tend to prove some material element of the crime under investigation, such as guilty knowledge or some specific intent, they

may be introduced in evidence. *Fossdahl v. State,* 89 Wis. 482, 62 N. W. 185; *Paulson v. State,* 118 Wis. 89, 94 N. W. 771.

In the present case premeditated design to effect wrongful death was essential to a conviction. In its absence there could not be murder in the first degree. If the occurrences of October 6th, 7th, and 8th had been placed before the jury without explanation, it might perhaps still be claimed that the defendant had no certain knowledge that the mission of the men who stealthily approached his house armed to the teeth was lawful. Indeed, it very clearly appears from the cross-examination of Mr. Gilbert by the defendant, as well as from many remarks made by the defendant during the trial, that he took the position on the trial that he was justified in believing that Mr. Gilbert was not the person or official he represented himself to be, but was attempting to deceive him, and that he (*Dietz*) was justified in believing that the men who surrounded his house were not officers, but agents of a lumber company which he thought was endeavoring to obtain his property and ruin him financially. So seriously was this contention made by the defendant that the trial judge carefully submitted to the jury the question whether the shooting was done in lawful defense of the defendant's dwelling house. We think it clear that it was competent to negative this possible innocent intent or condition of mind on the part of the defendant, and establish the fact that he had the criminal intent which must be present in order to constitute murder, by the evidence of his previous acts of resistance to officers, and his threats that he would shoot them on sight, and that he would never be taken alive.

The principle on which such evidence is received to show intent or state of mind is simply the principle which the human mind instinctively applies in ordinary affairs of life. If the question be whether a given act was accidental or intentional, the fact that the actor has at numerous times performed similar acts under circumstances forbidding the idea

of accident is very strong proof that the act under investigation was also intentional.

Mr. Wigmore in his work on Evidence (vol. 1, § 302) thus very clearly states the idea:

"In short, similar results do not usually occur through abnormal causes; and the recurrence of a similar result (here in the shape of an unlawful act) tends (increasingly with each instance) to negative accident or inadvertence or self-defense, or good faith, or other innocent mental state, and tends to establish (provisionally at least, though not certainly) the presence of the normal, i. e. criminal, intent accompanying such an act."

It is true that some of the acts of resistance to arrest in the present case were remote in point of time from the act under investigation, but that does not of itself render such evidence incompetent, especially where, as here, the acts were repeated year after year down to a comparatively recent period, and were all apparently inspired by one purpose, namely, the purpose to resist the execution of legal process.

The principle was in substance recognized and applied by this court in *Boyle v. State,* 61 Wis. 440, 21 N. W. 289, and is amply supported by authority in other jurisdictions. 1 Wigmore, Ev. §§ 302, 363, 364, and cases cited in notes; *Comm. v. Holmes,* 157 Mass. 233, 32 N. E. 6; *O'Boyle v. Comm.* 100 Va. 785, 40 S. E. 121; *People v. Jones,* 99 N. Y. 667; *Sayres v. Comm.* 88 Pa. St. 291; *Koerner v. State,* 98 Ind. 7; *State v. Lapage,* 57 N. H. 245; Underhill, Crim. Ev. (2d ed.) § 90.

The general principle is thus tersely stated in *State v. Lapage,* 57 N. H. 245, at page 288:

"Any act of the prisoner may be put in evidence against him, provided it has any logical and legal tendency to prove any matter which is in issue between him and the state, notwithstanding it might have an indirect bearing, which in strictness it ought not to have, upon some other matter in issue."

Now, in the present case, after the killing of Harp was

proven without dispute, there were two principal issues be-
tween the defendant and the state, namely, (1) whether the
defendant fired the shot which killed Harp, and (2) if so,
whether the shot was fired with the necessary premeditated
criminal design to kill.   If it were to be admitted that upon
the first issue the evidence of the previous acts of resistance
had no legitimate bearing, still upon the second issue it was
certainly very persuasive in repelling the idea that the shot
was fired in lawful self-defense.   If the defendant had on
numerous occasions in the past, with firearms and threats of
violence, resisted officers who he was fully informed were
seeking only to arrest him upon legal warrants, the inference
would be strong against his contention that on the occasion in
question here he was justified in supposing, or did suppose,
that the men approaching his home were wrongdoers whom he
could lawfully resist to the point of shooting, if necessary.
It appears from the record that the trial judge was careful to
state the grounds on which the evidence was admitted.   He
distinctly stated, when objection was made to this kind of evi-
dence, that it was admissible simply to show the defendant's
*attitude* towards the officers.   He repeatedly declined to allow
the evidence of the previous occurrences to proceed unless it
was first clearly proven that an arrest under legal process was
being attempted, and that the defendant was informed of the
fact, and said in substance several times that only resistance
to arrest could be shown.

But while we think the evidence in question was clearly ad-
missible to show criminal intent, we are quite well convinced
that this is not the sole ground of admissibility.   The officers
of the law were attempting to make the arrest of the defend-
ant at the time in question in a most extraordinary manner.
The tale sounds like an extract from the annals of a Mexican
revolution.   Instead of proceeding quietly, with perhaps a
single deputy, to the defendant's residence, and taking him
into custody without disturbance, the sheriff levied a veritable
army of deputies, armed them with rifles, surrounded the

house as though it were a hostile fortress, and conducted a regular siege or battle before accomplishing his purpose. No peace officer would be justified in making any such display of force under any ordinary circumstances. The question whether there was any necessity for such action would inevitably appeal strongly to any jury. If there was no necessity, the proceeding was not only indefensible, but positively shameful and lawless. The jury, it would seem, had a right to know what circumstances justified it, and they could only know that by knowing the previous difficulties between the defendant and the officers. While this bears directly on defendant's intent, its bearing is not confined to that alone,—it is necessary in order that the jury may have a complete picture of the situation, a picture to which the jury was entitled before rendering their verdict.

Further, so far as the defendant *Dietz* himself is concerned, there is another aspect of this testimony which has great significance: the evidence tends to show that on several of the previous occasions when the defendant resisted arrest he accompanied his resistance with threats of violence or death to any one attempting to arrest or serve process upon him, and statements that no such person would ever get him. These threats appear to have been made so generally and frequently that the jury would have been entirely justified in concluding that they were not confined to the particular attempted arrest on the occasion when they were uttered, but covered any such attempt which might be at any time made. They seem to indicate a fixed determination to shoot, if necessary, any officer of the law rather than allow such officer to arrest or serve process upon him.

If they are fairly capable of this construction, then it seems that the evidence of resistance to arrest upon former occasions tended unmistakably to show that the defendant had a general plan or design in mind which included the act for which he was being tried, namely, the general plan never to submit

to arrest. Under this view of this evidence it was not confined in its probative effect to the question of the defendant's intent, but was admissible generally because it tended to prove a general design or system, of which the shooting of Harp was simply an integral part necessary to the successful consummation of the design or system. 1 Wigmore, Ev. § 304.

This seems to be a complete answer to the claim that fatal error was committed because the trial judge did not in his charge caution the jury that the evidence of the previous conflicts between the defendant and the officers was only to be considered upon the question of the defendant's intent. In strictness this contention might be answered by the simple statement that no such instruction was requested. *Birmingham v. State,* 145 Wis. 90, 129 N. W. 670; *Beauregard v. State,* 146 Wis. 280, 131 N. W. 347. Inasmuch, however, as the defendant in the present case declined to have the assistance of an attorney and tried his own case, we have not wished to apply any strict rule of practice, especially in view of the fact that it has been held by some courts that, where evidence is only admissible to prove intent, it will be prejudicial error not to confine its effect to that single purpose in the instructions to the jury. *Comm. v. Shepard,* 1 Allen, 575.

Error is alleged because the state was allowed to prove that a loaded set gun was found on the side of the lumber piles with the trigger attached to a copper wire running along the whole length of the lumber piles, so that any one passing between the piles towards the house was liable to run against the wire, pull the trigger, and receive the contents of the gun. Error is also alleged in the admission of evidence showing that three large bear traps were found set just in the edge of the woods on the outskirts of the *Dietz* farm, where the officers were likely to make their entry. There was no error in the admission of the evidence of either of these facts. Both of them tended to show preparation or design to make forcible

and deadly resistance to arrest by the officers of the law. This class of evidence is quite universally recognized as admissible for very persuasive reasons. 1 Wigmore, Ev. § 238.

It is said that the court allowed the complaint in the criminal case of the state against *Dietz* for assault with intent to kill upon Bert Horrell, September 6, 1910, to be read to the jury, and this is alleged to be error. As matter of fact, it appears from the record that no such ruling was made. The warrant which was issued upon the complaint was received in evidence and read to the jury upon the examination of Sheriff Madden, because the sheriff was endeavoring to arrest the defendant under this warrant at the time of the shooting of Harp, and hence it was necessary to be shown in order to justify the armed approach to the *Dietz* homestead.

2. It is argued that the trial judge committed error in not charging the jury that there might be a conviction for murder in the second degree, or some of the lesser degrees of manslaughter, instead of submitting only the question of murder in the first degree. Here, again, it would be sufficient perhaps to say that no instructions submitting the lesser degrees of crime were requested, but we prefer to place our ruling upon the broader ground that under the evidence there was no room for any intermediate finding. The defendant was either guilty of murder in the first degree or he was innocent.

Objection is made to certain instructions on the ground that they contained erroneous statements of facts not in evidence. We have carefully examined the instructions so objected to and find no basis for the charge. The trial judge seems to have been very careful to make accurate statements whenever he had occasion to refer to matters of fact in his charge. As a whole the charge seems to us a clear, accurate, and fair statement of the legal principles which were applicable to the evidence in the case. The effort of the trial judge to clearly state to the jury every legal proposition favorable to the defendant, or which could properly be said to be neces-

sary and proper for the jury to know in considering the question of his guilt, is very apparent.

A minor contention is made which will be briefly noticed here, although it does not relate to the charge of the court. Upon affidavits alleging prejudice of the circuit judge of Sawyer county, the Hon. ALEX. H. REID, circuit judge of the Sixteenth judicial circuit, was called in to preside at the trial.    Thereupon an application was made by the defendants for a change of the place of trial, based upon a number of affidavits tending to show prejudice on the part of the people of Sawyer county.   Although no affidavits were filed in opposition, the application was denied, and properly so.   It is settled that the calling in of the judge of an adjoining circuit to try a case in which an affidavit of prejudice has been filed against the presiding judge is a change of venue within the meaning of the statute.   *Perrin v. State,* 81 Wis. 135, 50 N. W. 516.   There can be but one change of venue in a criminal action.   Sec. 4680, Stats. (1898); *Baker v. State,* 88 Wis. 140, 59 N. W. 570; *Perrin v. State, supra.*   As matter of fact, the record shows that a jury was easily obtained, and that the state used but two of its peremptory challenges and the defendants but three, and that the defendants waived any further strikes after full explanation and understanding of their rights.

3. The final contention is that a new trial should have been granted, because justice has not been done.

Most of counsel's oral argument was directed to this proposition, and to its consideration we have devoted the most time. The typewritten record of the trial covers nearly 1,200 pages, and to examine that record thoroughly is no light task.   However, the defendant is entitled to the deliberate opinion and judgment of this court upon the question whether justice has been done, and hence we have felt it to be our duty to examine the record carefully and thoroughly.   After that examination we feel compelled to say that it seems to us that the evidence

was amply sufficient to warrant the verdict.    The evidence of a long settled determination on the part of the defendant not to submit to arrest by the officers of the law was plenary and overwhelming.    In addition to this, the evidence that he knew perfectly well the mission of the sheriff and his deputies on the occasion in question was conclusive.    He had turned his house and barn into strongholds, provided himself with guns and ammunition in abundance, and deliberately refused to submit to the process of the law.    The fact that Harp was killed while approaching the defendant's house by a rifle bullet which came from the direction of defendant's barn, and that the bullet was of a caliber corresponding to one of defendant's guns, is proven without serious dispute.    In addition to this, witnesses testified to seeing the flash as the shot was fired coming from the so-called porthole in the roof of the defendant's barn, and further testified that they saw defendant go to the barn from the house with what looked like a gun in his hand a short time before the shooting of Harp.    There was also testimony that the defendant was seen to return to the house from the barn with his gun about three hours later.    It was also in evidence that empty shells of the same caliber as the bullet which killed Harp were found in the second story of the barn by the officers after the affair was over and the defendant had surrendered.    In addition to all this, there was evidence which seemed to show that none of the sheriff's deputies were in position where they could have fired the shot so that it would apparently come from the direction of the barn.    There were indeed some deputies on the other side of the farm at the distance of about a quarter of a mile from Harp, but the evidence seems to show that their positions were such that none of them could have reached Harp with a direct shot, on account of intervening obstacles.    It was suggested that possibly a shot fired by one of them might have struck the barn and been deflected from its course and thus reached

Harp.   But when it is remembered that the bullet entered Harp's mouth, shattered the jaw bone, and went through the entire body, lodging finally against the thigh bone, it is quite evident that such an explanation of the shot is entirely unsatisfactory.   The testimony tends to show that a bullet which had struck or passed through an obstacle and met with such resistance as to be substantially deflected from its course could not be likely to have force enough left to travel nearly 700 feet and pass entirely through the length of a man's body from mouth to thigh bone, and this testimony certainly accords with common sense.

The testimony seems to us to be ample to justify the conclusion of the jury that the bullet which killed Harp came from a rifle fired through a hole in the roof of the *Dietz* barn, and that such rifle was fired by the defendant; in fact we are unable to see how a jury could honestly come to any other conclusion.   Few facts depending largely on circumstantial evidence are more satisfactorily proven than was the main fact in this case.

Another contention, however, merits and has received serious consideration, and that is the contention that the court should have appointed an attorney to defend the plaintiff in error, or at least to act as *amicus curiae* and see that his rights were fully preserved.

It appears by the bill of exceptions that at the very opening of the trial, in response to inquiries by the trial judge, the defendants severally stated to the court that they preferred and intended to try the case without an attorney, and in addition thereto the plaintiff in error stated that he was able to employ an attorney if he desired, and that he had already had about 200 applicants for the position.   It appears that the trial then proceeded to the end, a period of twelve days, with no attorney representing any of the defendants.   It is now said that the plaintiff in error was an unlettered man, had no

knowledge of the law, had never tried a case, and should not have been allowed to defend himself and his wife and son against a prosecution for the highest crime known to the law. Practically the claim is that the trial court was guilty of denying him a fair trial because it did not appoint an attorney to assume charge of the defense against the wishes of the defendants. It is worthy of note that as a result of this trial without counsel Mrs. Dietz and Leslie were at once acquitted. So far at least as they were concerned the most able counsel could have done no better. A critical examination of the record must also impress one with the fact that the plaintiff in error was by no means a stranger to courts or their proceedings. From the beginning to the end of the case it appears that he made objections to the admissibility of evidence offered, and to the form of questions, in language clearly showing an accurate perception of the reason for the objection, which in some instances could hardly have been improved by an accomplished lawyer. He made due and timely objection to all the testimony tending to prove previous resistance to officers. It will be interesting and illustrative to quote verbatim an objection and motion made by him concerning certain evidence of this nature, viz.:

"*John F. Dietz:* If the court please, they have offered all the evidence in this Harp murder charge that can be introduced in any of the other three cases pending against me in the courts of Sawyer county. It is incompetent evidence in this case, nothing to do with the Harp murder charge whatever. The fact for the court and for the witness to prove before this jury is whether the three defendants are guilty of killing Oscar Harp; it don't make any difference how many times we have resisted arrest or anything of the kind. It don't make any difference whether I resisted the officers of the law that day. The fact to prove before this court is that these three defendants did kill Oscar Harp or not. This other evidence is incompetent and I object to it and I move that all of it be stricken from the record."

Without going further, it is sufficient to say that it appears that *Mr. Dietz* from beginning to end of the testimony was very active in the assertion of his real or supposed rights, and made objection in due season to practically all of the testimony the admissibility of which could be said to be in substantial doubt.  So far as matters of real substance are concerned, it is not perceived how the most astute counsel could have materially aided him by way of objections to the admissibility of evidence.  Nor is it by any means certain that a lawyer could have helped him at all in the argument of the case.  *Mr. Dietz* addressed the jury in his own behalf evidently with fluency and force, for it appears that he was frequently interrupted by counsel for the state for the reason that he was traveling outside of the record.  An argument of this nature by a man whose liberty is hanging in the balance may well appeal to an American jury with greater force than the argument of a skilful lawyer.

This, however, is not the question.  We have referred to these matters simply to show that the defendants were not incompetents or innocents, who sat mutely in court and allowed the prosecuting attorneys to do as they chose, but rather that they managed their case with a shrewdness and knowledge of their substantial rights which was not only surprising but which may well have been fully as effective as if the defense had been conducted by an attorney.

Every person *sui juris,* who is charged with crime, has the right to try his own case if he so desires.  The constitution guarantees him the right to be heard "by himself" as well as by counsel.  Const. art. I, sec. 7.

The trial court would not have been justified in imposing counsel upon the defendant against his will, unless indeed it appeared that he was mentally incompetent, or not *sui juris* at the time of the trial.

We see nothing substantial to justify any such idea.   Evi-

dently the trial judge, whose ability, honesty, and earnest desire to safeguard the defendant's rights are not open to question, saw nothing indicating such mental incompetency or insanity. Had he seen that there was even a probability that such a condition existed, it would have been his ·duty at any stage of the trial to halt the proceedings and make an inquisition of the question. Sec. 4700, Stats. (1898); *Steward v. State,* 124 Wis. 623, 102 N. W. 1079.

The main ground upon which. it is now urged that the defendant's incompetency appears is because of the fact that he declined to employ an attorney. The cogency of this fact as proof of incompetency may well admit of doubt.˙ Certainly we cannot say, after examination of the record in this case, that he made any mistake in his decision. It does not seem at all within the range of possibilities that any attorney could have made the facts of this case which point towards the defendant's guilt appear any less convincing. Were it a case where the evidence was scanty and the conclusions doubtful, a different question might possibly be presented. As it is, we cannot feel that we are required or even authorized to interfere with the result. The defendant, after long and patient forbearance on the part of the officers of the law,—a forbearance which amounted really to weakness,—deliberately chose to take up arms and defy the state. Such things cannot be if social order is to be maintained among us. Our civilization is based on the fundamental idea that there must be just and uniform laws, administered by honest and fearless courts, and that every citizen must obey the process of such courts. If it be once admitted that any citizen may take the law in his own hands and resist the officers of the law with gun or sword, there is an end of government by law. Such a condition of things means anarchy and barbarism.

As a result of the defendant's defiance of law, Oscar Harp, who was innocent of wrong, went to his death without warn-

ing. After a patient and fair trial the defendant has been found guilty of that death upon ample evidence. Pity the defendant as we may, we have no choice of courses on this record. It is as true now as it was in the days of the Hebrew prophet that he who sows the wind must needs be content if he be compelled to reap the inevitable whirlwind.

*By the Court.*—Judgment affirmed.