THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* JUAN RAMÓN GONZÁLEZ, Defendant and Appellant.

No. 8228. Argued December 19, 1940.—Decided January 29, 1941.

*Edgar S. Belaval* for appellant. *George A. Malcolm, Attorney General, R. A. Gómez, Prosecuting Attorney,* and *Luis Negrón Fernández, Assistant Prosecuting Attorney,* for appellee.

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the court.

On November 28, 1938, the District Attorney of San Juan filed an information against Juan Ramón González, José Alberto Muriel, and Mariano Rosario Centeno for the murder of Juan Santa, committed in Loíza, at night, on the 9th of the previous October.

González asked to be tried separately and, upon the trial being held, the jury found him guilty of murder in the first degree, and the court sentenced him to life imprisonment.

He appealed, assigning in his brief seven errors claimed to have been committed by the trial court 1, in denying his motion for a bill of particulars; 2, in allowing his identifi-

cation to be made in an improper way; 3 and 4, in permitting the introduction at the trial of testimony regarding acts and statements of Alvaro López and of one Pascual; 5, in permitting the district attorney to bring to the knowledge of the jury a testimony which was not in evidence; 6, in weighing the evidence; and 7, in denying his motion for a new trial.

After a careful study of the record and of the briefs, we feel bound to reverse the judgment appealed from, as the fifth of the errors assigned has been committed, and similarly as to the seventh which is dependent upon the fifth.

Said fifth error, as set forth in the brief, textually reads as follows:

"V. The Honorable District Court of San Juan erred in permitting the erroneous action on the part of the district attorney in bringing to the knowledge of the jury a testimony which was not in evidence."

From the transcript of the evidence it appears that the following witnesses for the prosecution had testified: Antonio Navas, the surgeon who made the *post-mortem* examination of the body of Juan Santa; José Ruidíaz, owner of the shop near the Central Canóvanas, who remained on watch near the corpse of Santa which lay in front of the shop; Luis Vélez, whom José Alberto Muriel met on the night of the occurrence and asked about the accused; Alvaro López, from whom Vélez inquired as to González at the instance of Muriel; Epifanio Díaz, who on the night of October 9, 1938, saw the accused running near the shop of Ruidíaz; Félix Santiago, who on that night passed by that place leading a cow and saw that the defendant, Mariano, and a negro were holding Santa behind the shop of Ruidíaz; Francisco Hernández, who on the same night heard the defendant talking with Mariano Rosario Centeno in the latter's room where the defendant was going to sleep, and it seemed to him that the defendant was urging Mariano to hand him something; Antonio Cruz, a refreshment vender, whom Muriel, on the night of the occurrence and at the public square in

Canóvanas, asked about the accused; José Calderón, the driver who on said night carried the defendant and his companion, a dark person, with side whiskers, sitting on a baggage rack in the rear of his car, from Canóvanas towards the central and saw them jump off and run away before reaching the latter place; and Antonio Torres, who saw the defendant in Canóvanas at about half-past seven and then again at about half-past ten.

It further appears from the transcript that the witnesses for the defense Francisco Torres, Carmen Méndez, Gerarda Flores, Pablo Rojas, Gabriel Benabe, Francisco Vázquez, Isabelo Fuentes, Quintina Fermaint, Amado López, Nicasio Esquilín, Ezequiel Ortiz, Eduardo García, Felipe Hernández, Ricarda Hernández, Justa Rivera, and Inés Dávila had already testified, all of them as to the fact of having seen the accused on the public square of Canóvanas, where a patronal festival was being held at about the time the crime was committed; and that the district attorney was cross-examining the defendant when the following occurred:

"Q. You supposed that when Antonio, the ice-cream vendor, told you that Muriel was looking for you it was for the purpose of giving you some good news, yet when the police asked you, you said, 'Muriel was here and he is a dangerous man'?

"A. Antonio, the ice-cream vendor, told me that Muriel was looking for me and that he was wearing blue trousers, a blue shirt, and a felt hat.

"Q. Why was it that you told the police and created some suspicious against José Alberto Muriel as to the crime, and yet when Mariano Rosario charged you with the crime then you did not say anything about Mariano Rosario but insisted as to Muriel?

"Defense: There is no evidence that Mariano Rosario had stated anything regarding the crime. There has been nothing as to that in the testimony of the witness.

"Prosecuting Attorney: I am trying to impeach the veracity of the witness in the sense that, since he has related his activities on the night of the occurrence, I am laying the foundation for impeaching his testimony.

"Judge: Let us first ask the witness whether Mariano Rosario charged him in his presence with the crime, if Rosario made such a charge. If the defendant denies it, he can not be questioned further on that.

"Defense: I object to any question as to whether Mariano Rosario charged José Ramón González with the crime.

"Judge: I am going to put a question to the defendant.

"Judge: Did Mariano Rosario charge you with having committed that crime?

"A. No.

"Q. Did Mariano Rosario state in your presence that you had committed that act?

"A. Not in my presence.

"District Attorney: Do you remember that you were in my office and that there Mariano Rosario, in your presence and in the presence of José Alberto Muriel, told me and described your participation in the crime?

"A. He did not say anything about my participation.

"Q. Is it true or not that Mariano Rosario stated in your presence and in the presence of José Alberto Muriel that he, Mariano Rosario, and you had come out of the living quarters at the central and had met Muriel and went to the shop?

"A. I do not remember whether he said that.

"Defense: We object to those questions.

"Judge: The court is going to allow the question because it is on cross-examination.

"Defense: We take an exception.

"Q. Is it not a fact that at that time you raised some suspicions as to José Alberto Muriel?

"A. I did not raise any suspicions; I only told the policeman that that man had been inquiring about me.

"Q. Is it not a fact that you did not say anything regarding Mariano Rosario?

"A. I did not know anything about that.

"Q. Do you remember that I sent for you, for Mariano Rosario, and for José Alberto Muriel.

"A. No, sir, I have nothing further to testify.

"District Attorney: It is for the court to say whether or not the witness is bound to testify.

"Defense: I maintain that the question asked by the district attorney is inadmissible.

"Judge: The court holds that the question of the district attorney is admissible.

"Defense: We take an exception.

"District Attorney: Well, I have no further questions to ask."

After the close of the evidence for the defense, the district attorney confined himself on rebuttal to introducing the witness Luis Villalobos, whose testimony was limited to the fact that there was no tower clock at the public square of Canóvanas. And the taking of the evidence was then completed.

It can not be tolerated that the district attorney, on the pretext of impeaching the testimony of a witness, should carry to the minds of the jurors the impression that a certain evidence of guilt against the accused exists when there is no antecedent in the record to justify it, and when not even the smallest attempt is subsequently made to establish the announced contradiction.

The defendant in his brief maintains that the statements of Rosario Centeno to which the district attorney referred, if at all made, could not have been independently admitted in evidence, because they would have followed in point of time the termination of the conspiracy, because it was not shown that they were made in the presence of the accused, and because it was not proved that the accused by his silence had assented thereto. Furthermore, because they could not have been admitted either for the purpose of impeaching the testimony of the accused while the latter testified on his own behalf, as they had not been covered by the direct examination, because in point of fact they did not impeach his veracity, because if they existed at all, they had been voluntarily suppressed by the district attorney, and because in any event they should have formed part of the evidence in chief, being inadmissible on rebuttal. And, lastly, because they were based on evidence which was in itself inadmissible, and because of the improper form in which they were intro-

duced, assuming the existence of facts which were not in evidence.

We will not follow the appellant into all the grounds which he has advanced to support his assignment of error. We will stop to consider only the last ground, that is, the one relating to the form in which the supposed charges made by Centeno were introduced in the proceedings.

In the case of *Buel v. State,* 80 N.W. 78, 83, decided by the Supreme Court of Wisconsin, and in which the judgment of conviction was reversed and a new trial ordered, Mr. Justice Marshall speaking for the court said:

"The administration of justice requires that trial courts shall not have their discretionary powers circumscribed by any very narrow boundaries, but does require that such limit shall be placed upon them as will prevent any mere prejudice to be built up in the course of a trial, especially in an important case like this, which will tend to influence a jury to determine the facts otherwise than from the legitimate evidence produced in court. It seems clear that such limit was passed in allowing the cross-examination in question, to the extent to which it was carried. It is one thing to honestly ask questions on cross-examination for the purpose of discrediting a witness, and quite another to ask questions of a witness who is a party, especially in a serious criminal case, for the purpose of injuring his cause in the eyes of the jury, and leading them to believe he was likely, because of his bad character, to have committed the offense charged. A reading of the questions under consideration leads to the irresistible conclusion that no idea was entertained by the cross-examiner that proof would be elicited of the matters implied by them. We say 'implied' because the asking of the direct questions in the manner in which they were asked, implied to some degree that the examiner was possessed of information upon which the questions were based, and although the answers were in the negative, the bad effect of the insinuations thrown out by the questions was not and could not have been removed entirely from the minds of the jurors. It is useless to refer to authorities on this subject. Text writers and adjudged cases are generally in accord that, so long as the cross-examination is carried on with reasonable fairness, to test the credibility of the witness, it is permissible, but the moment questions are asked concerning facts touching the witness' character, which are irrelevant to the facts in

issue, for any other purpose than to affect his credibility or which manifestly do not bear on the subjects of credibility, the right of cross-examination is abused, and on objection should be restrained within legitimate limits. Whart. Ev. secs. 473, 477, and notes.''

The instant case is even stronger. Through the information filed, the jury learned that the crime was charged as having been committed by the defendant jointly with Muriel and Centeno, and the evidence introduced tended to show the violent death of Santa and to suspiciously connect the defendant with Muriel and Centeno as present in the neighborhood and at the place of the occurrence, a witness, Félix Santiago, having testified that the three of them ''were holding Juan Santa.''

Under those circumstances, to let drop into the consciousness of the jury, through the repeated questioning not only of the district attorney, but of the judge, the fact that Centeno had testified before the district attorney and in the presence of the accused, in the sense of charging the latter with the commission of the crime, is something which goes beyond the widest and most liberal scope that might be allowed for cross-examination, and which must necessarily have left a profound impression in the minds of the jurors as to the final result of the scene described by the witness Santiago, and which seems to have been specially calculated by the district attorney, with the conscious or unconscious aid of the court, to produce that impression. To sanction such practice would be to destroy the foundations on which our system of criminal procedure rests.

Our fundamental law—section 2 of the Organic Act, to provide a civil government for Puerto Rico and for other purposes approved March 2, 1917—guarantees the right of the accused in all criminal prosecutions to be confronted with the witnesses against him, and provides that no person shall be held to answer for a criminal offense without due process of law.

Here the introduction of the testimony of Centeno in the surreptitious way in which it was done had the effect of depriving the accused of his right to be confronted with this witness, and consequently, he was punished without due process of law. A judgment of conviction thus rendered can not stand.

The appeal must be sustained, the judgment appealed from reversed, and a new trial ordered.